**Robert A. McCLURE, Petitioner Appellant,**

v.

**Frank THOMPSON, Respondent– Appellee.**

**No. 01–35593.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 8, 2002.

Filed April 2, 2003.

Steven T. Wax, Federal Public Defender's Office, Portland, OR, for the petitioner-appellant.

Daniel J. Casey, Justice Department, State of Oregon, Salem, OR, for the respondent-appellee.

Before FERGUSON, W. FLETCHER, Circuit Judges, and KING,* District Judge.

Opinion by Judge WILLIAM A. FLETCHER; Dissent by Judge FERGUSON.

## OPINION

WILLIAM W. FLETCHER, Circuit Judge:

Oregon state prisoner Robert A. McClure appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition challenging his jury trial conviction for three aggravated murders. McClure's original defense attorney, Christopher Mecca, placed an anonymous telephone call to law enforcement officials directing them to the locations of what turned out to be the bodies of two children whom McClure was ultimately convicted of killing. The district court rejected McClure's arguments that the disclosure constituted ineffective assistance of counsel, holding there was no breach of the duty of confidentiality and no actual conflict of interest. We affirm.

## I. Background

### A. Offense, Arrest and Conviction

On Tuesday, April 24, 1984, the body of Carol Jones was found in her home in Grants Pass, Oregon. She had been struck numerous times on the head, arms and hands with a blunt object. A gun cabinet in the home had been forced open and a .44 caliber revolver was missing. Two of Jones' children—Michael, age 14, and Tanya, age 10—were also missing. The fingerprints of Robert McClure, a friend of Jones, were found in the blood in the home. On Saturday, April 28, McClure was arrested in connection with the death of Carol Jones and the disappearance of the children.

That same day, McClure's mother contacted attorney Christopher Mecca and asked him to represent her son. As discussed in more detail below, sometime in the next three days, under circumstances described differently by McClure and Mecca, McClure revealed to Mecca the separate remote locations where the children could be found. On Tuesday, May 1, Mecca, armed with a map produced during his conversations with McClure, arranged for his secretary to place an anonymous phone call to a sheriff's department telephone number belonging to a law enforcement officer with whom Mecca had met earlier.

Later that day and the following day, sheriff's deputies located the children's bodies, which were in locations more than 60 miles apart. The children had each died from a single gunshot wound to the head. Mecca then withdrew from representation. On May 3, McClure was indict-

---

* The Honorable George H. King, United States District Judge for the Central District of California, sitting by designation.

ed for the murders of Carol Jones and her children. At trial, the prosecution produced extensive evidence that stemmed from the discovery of the children's bodies and introduced testimony regarding the anonymous phone call. McClure was found guilty of all three murders and was sentenced to three consecutive life sentences with 30–year minimums. On direct appeal, his conviction was affirmed without opinion. *State v. McClure,* 80 Or.App. 461, 721 P.2d 482 (1986), *rev. denied,* 302 Or. 158, 727 P.2d 128 (1986).

### B. Disclosure of the Children's Whereabouts

The parties agree that Mecca and McClure met at the jail and spoke on the telephone on a number of occasions between April 28 and May 1. However, the substance of the conversations between McClure and Mecca are the subject of significant dispute.

Mecca recorded his account in notes that he wrote immediately after the children's bodies were discovered. Mecca also gave deposition testimony for McClure's state post conviction proceeding, submitted an affidavit prior to McClure's federal habeas proceeding, and gave testimony at the federal district court evidentiary hearing in the habeas proceeding. In his notes, Mecca wrote that McClure had initially claimed that he was "being framed" for the murder, but that he was nervous about his fingerprints being in the house. He had asked Mecca to help him remove some other potential evidence, which Mecca declined to do. According to the notes, on the Sunday night after McClure's Saturday arrest, Mecca received a "frantic phone call" from McClure's sister, who was convinced that McClure had murdered Jones, but had reason to believe that the children were alive and perhaps "tied up or bound someplace." In response, Mecca set up a meeting with McClure, his sister and his mother at the jail, at which

McClure's sister "directly confronted [McClure] and begged him to divulge information about the whereabouts of the kids." McClure and his sister discussed how McClure sometimes did "crazy things" when he was using drugs, but McClure strongly maintained his innocence as to Carol Jones' murder and the children's disappearance.

According to his notes, when Mecca next spoke with McClure on Monday, McClure was less adamant in his denial. Mecca described how, when they met on Monday afternoon, McClure began to tell him of his "sexual hallucinations and fantasies" involving young girls and about "other situations that happened in the past . . . involving things he would do while under the influence of drugs." "It was at that time," Mecca wrote, "when I realized in my own mind that he had committed the crime and the problem regarding the children intensified." Mecca wrote that he "was extremely agitated over the fact that these children might still be alive."

After a Monday night visit to the crime scene, Mecca returned to the jail to speak with McClure again, at which time he "peeled off most of the outer layers of McClure and realized that there was no doubt in my mind that he had . . . killed Carol Jones." McClure told Mecca he wanted to see a psychiatrist, then launched into "bizarre ramblings." "[E]ach time as I would try to leave," Mecca recalled in his notes, "[McClure] would spew out other information, bits about the children, and he would do it in the form of a fantasy." Mecca wrote that he "wanted to learn from him what happened to those children." He told McClure "that we all have hiding places, that we all know when we go hiking or driving or something, we all remember certain back roads and remote places," and that McClure "related to me . . . one place where a body might be" and then "de-

scribed [where] the other body would be located." Mecca wrote that he "wasn't going to push him for anything more," but "when I tried to leave, he said, and he said it tentatively, 'would you like me to draw you a map and just give you an idea?' and I said 'Yes' and he did[.]" Mecca recorded that "at that time, I felt in my own mind the children were dead, but, of course, I wasn't sure."

Very late on Monday evening, McClure telephoned Mecca at home and said, "I know who did it." Mecca recorded in his notes that the next morning he went to meet with McClure, and asked him about this statement. McClure told Mecca that "Satan killed Carol." When Mecca asked, "What about the kids?" McClure replied, "Jesus saved the kids." Mecca wrote in his notes that this statement "hit me so abruptly, I immediately assumed that if Jesus saved the kids, that the kids are alive[.]" Mecca wrote that he "kind of felt that [McClure] was talking about a sexual thing, but, in any event, I wasn't sure."

Mecca's notes indicate that on Monday, before McClure made the "Jesus saved the kids" comment, and again on Tuesday, immediately after the meeting at which he made that comment, Mecca had conversations with fellow lawyers, seeking advice regarding "the dilemma that [he] faced." After the second of these conversations, which took place Tuesday morning, Mecca arranged for a noon meeting with the undersheriff and the prosecutor. At the meeting, he "mentioned to them that I may have information which would be of interest to the State" and attempted to negotiate a plea. When the prosecutor responded that there would be no deal, Mecca recorded in his notes, "I had made up my mind then that I had to do the correct thing. The only option I had, as far as I was concerned, was to disclose the whereabouts of the body [sic]." (Recall that by the time Mecca wrote these notes,

he had learned that the children were dead.) A law enforcement official testified in a federal court deposition that, after both the state bar association and the attorney general "recommended that it would be unwise for Mr. Mecca to provide us information," Mecca "indicated that, even though there might be sanctions, that he still was wanting to provide information that he had regarding the children." Mecca stated that when he spoke with McClure's sister and mother, they were adamant that he do whatever he could to locate the children, and that "[t]hey were still under the impression that one or both of the children were alive, or at least there was a chance they were alive."

Mecca then returned to the jail Tuesday afternoon and, according to his notes, "advised McClure that if there was any possibility that these children were alive, we were obligated to disclose that information in order to prevent, if possible, the occurrence of what could be [the elevation of] an assault to a murder, for instance. I further indicated that if he really requested psychiatric help, to help him deal with his problem, that this perhaps was the first step." "In any event," Mecca recorded in his notes, "he consented." "I arranged to have the information released anonymously to the Sheriff's Department with directions to the bodies." He noted that there was "no provable way to connect" McClure to the information, "but I think it's rather obvious from those in the know, who the information came from."

In the deposition conducted in conjunction with McClure's state habeas proceeding, Mecca gave a similar account of the events surrounding disclosure of the locations of the children. He emphasized that "it all happened relatively quickly" and that there was a public "hysteria about these kids, whether the kids were dead, whether the kids were alive." Mecca reit-

erated that much of the later conversations with McClure consisted of hypotheticals and fantasies—"like he was playing a game with me"—but that it was clear that McClure wanted to tell him where the children were. Mecca stated in his deposition that "the condition of the children [was] never discussed," but that the insistence by McClure's mother and sister that McClure wouldn't hurt the children put him "in this mode [of thinking] these kids might be alive someplace."

Mecca testified in his deposition that he thought that if the children were alive, it might relieve McClure of additional murder charges, but that the children were his main concern. When asked if he was "primarily concerned with the children's welfare or . . . with Mr. McClure's welfare" at the time he disclosed the location of the bodies, Mecca replied, "At that point I was concerned with the children's welfare." When asked if he explained to McClure that "if they were in fact dead, that revealing the location of the bodies would lead to evidence which could implicate Mr. McClure in their murders," Mecca answered: "No. I don't think I had the presence of mind to sit down and analyze every single detail and go over with him, 'Geez, you know, if they are really dead, why don't you tell me.'" However, he testified, "McClure knew I thought there [was] a chance those kids were alive."

Mecca testified in the deposition that the plan to place the anonymous telephone call was his, but that McClure knew that he planned to do it, and that, in his late-night call, McClure had made clear that he "absolutely" "wanted to disclose where those kids were." When asked, "Did he give you permission to reveal this information?" Mecca responded, "Oh, yes."

In a 1999 affidavit submitted in conjunction with McClure's federal habeas proceeding, Mecca gave an additional statement regarding McClure's consent: "Mr.

McClure did not orally or expressly consent to the disclosure. I inferred consent from the circumstances, specifically, the fact that Mr. McClure called me at home on several occasions with the request that I see him at the jail, and the fact that he drew a map of the location of the bodies of the victim in his own handwriting and gave me the map."

In addition to reviewing Mecca's notes, his state-court deposition testimony, and his federal-court affidavit, the federal district court heard testimony from Mecca at an evidentiary hearing. In this testimony, Mecca emphasized that he generally takes a low-keyed approach to questioning his clients. He also emphasized that McClure was "fully engaged in his defense" and "was running the show." Every time they met or conversed, he said, it was at McClure's request. He said that he and McClure "discussed at various times various methods of what I was going to do with this information." Mecca testified that McClure never expressly said that he consented to the disclosure, and that Mecca never asked for such consent. He confirmed his earlier testimony that he inferred consent, and added for the first time that this inference was based on McClure's nodding, saying "okay," and otherwise manifesting assent. He said this was what he had meant when he had written in his notes that McClure consented. Mecca also reiterated that he never told McClure of the legal risks involved in disclosing the children's locations.

Mecca testified that after the Monday conversation with McClure, "[t]he conclusion I came to was that, without telling me, he told me he had killed three people." But he stated that he did not confirm that conclusion by directly asking McClure if it was the case. Instead, he said, he emphasized to McClure that if there was a chance the children were alive, they need-

ed to save them, and in response McClure "never said they [were] dead." After the "Jesus saved the kids" comment on Tuesday, Mecca testified, "I allowed myself to believe that these kids might somehow be alive." When asked on cross examination whether, at the time he decided to make the anonymous call, he thought there was "a strong possibility the kids still may be alive," Mecca responded that he "felt that it was a possibility. I wouldn't say a strong possibility." One of the reasons he felt this possibility existed, he said, was that his "client had not indicated anything differently." He testified that the possibility of saving his client from additional murder charges "was something that was going through[his] mind" during his decisionmaking. He noted that the weather at that time of year was "warm" and "pleasant," and that if the children had been left in the woods it was possible that the weather would not have contributed to their death.

McClure disagreed with Mecca's account of the events leading up to the anonymous call. In testimony in both the state and federal district court proceedings, he repeatedly insisted that he did not give Mecca permission to disclose any information and that he was reassured that everything he told Mecca would remain confidential. He said Mecca pressured him into disclosing information by setting up the meeting with his sister and mother, and then disseminated that information to his detriment without his knowledge or consent.

McClure testified that Mecca never asked him directly if the children were alive or dead, but that the hypothetical conversations that they had were about where Mecca might find dead "bodies," not live "children." He said his disclosure of those locations was his way of admitting to having killed them. He testified that Mecca never told him that he intended to make an anonymous telephone call.

## C. State Court Decision On Post–Conviction Review

In March 1995, an Oregon circuit court denied McClure's petition for post-conviction review, which had been premised in part on a claim that he had been denied effective assistance of counsel when Mecca revealed confidential communications without his permission and without properly advising him of the consequences of such a disclosure. In a two-page denial letter to counsel, the court stated that it "accept[ed] the credibility of the attorney over that of the petitioner's[sic] and f[ound] that petitioner did not disclose to the attorney that the children were dead." The disclosure, therefore, "could have been beneficial to petitioner if, in fact, the children were still alive." The court engaged in no other analysis on the point, but indicated that it was adopting as its own the arguments and conclusions stated in the assistant attorney general's memorandum. That memorandum's conclusions of law included the conclusion that "[p]etitioner received adequate assistance of trial counsel." Among the findings of fact included in the memorandum were the findings that "[t]rial counsel received petitioner's permission to anonymously disclose the whereabouts of the children to the authorities" and that "[b]efore petitioner authorized trial counsel to reveal the childrens' [sic] locations to authorities, trial counsel did not advise petitioner that if authorities located the children, he could be further implicated in the criminal activity and the evidence against him would be stronger."

McClure appealed the denial of post-conviction relief, again raising the ineffective assistance of counsel claim. The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. See McClure v. Maass, 143 Or.App. 360, 922 P.2d 731 (1996); 325 Or. 367, 939 P.2d 44 (1997).

### D. District Court Denial of Habeas Relief

The district court denied McClure's federal habeas petition. The court indicated that it found Mecca "highly credible" and that it disbelieved McClure. Noting that "Mecca admits that he did not ... advise petitioner [of the potential adverse consequences of disclosure]," it concluded that under the circumstances, this failure was "not unreasonable." It found that Mecca "informed petitioner that if the children could be alive, they were obligated to disclose the children's location to prevent further harm to them," that McClure was intelligent and engaged in his defense, that "common sense dictates that petitioner understood the consequences of his actions," and that "Mecca's assumption [that McClure was discussing the location of live children] was not unreasonable under the circumstances." It also held that, based on these circumstances, and on the fact that Mecca had attempted to determine whether the children were alive and McClure had led him to believe they were, "Mecca's failure to ask directly whether the children were dead was not unreasonable."

The federal district court accepted as not clearly erroneous the state habeas court's finding that Mecca received permission ·to disclose anonymously the whereabouts of the children, and stated that, even if McClure did not consent to disclosure, the disclosure was reasonable in light of the circumstances, including the facts that there was a potential benefit to McClure if the children were alive and that the decision was made "in response to a rapid and extraordinary chain of events as they unfolded." The court found that only McClure knew the true facts as to the children's condition, and that he deliberately withheld them from Mecca. It found that Mecca acted "under extremely diffi-cult circumstances," and that he "investigated to the best of his ability."

The court rejected McClure's argument that Mecca suffered from an unconstitutional conflict of interest. It found that "[d]espite petitioner's arguments to the contrary, no evidence suggests that Mecca collaborated with law enforcement officials. The fact that Mecca may have been motivated, in part, by concern for the children's welfare does not render Mecca's loyalties conflicted; it simply renders him a human being."

McClure timely appealed.

### II. Standard of Review

 The district court's decision to deny a 28 U.S.C. § 2254 habeas petition is reviewed de novo. *See Alvarado v. Hill,* 252 F.3d 1066, 1068 (9th Cir.2001). Findings of fact made by the district court are reviewed for clear error. *See Zichko v. Idaho,* 247 F.3d 1015, 1019 (9th Cir.2001). This clearly erroneous standard is significantly deferential, requiring a "definite and firm conviction that a mistake has been committed" before reversal is warranted. *See Easley v. Cromartie,* 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001); *United States v. Doe,* 155 F.3d 1070, 1074 (9th Cir.1998) (en banc). "If the trial court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Phoenix Eng'g & Supply Inc. v. Universal Elec. Co.,* 104 F.3d 1137, 1141 (9th Cir. 1997) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)); *see also United States v. Working,* 224 F.3d 1093, 1102 (9th Cir.2000) (en banc) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be

clearly erroneous."). This deference stems from the fact that "findings of fact are made on the basis of evidentiary hearings and usually involve credibility determinations." *Rand v. Rowland,* 154 F.3d 952, 957 n. 4 (9th Cir.1998) (en banc). These credibility determinations are also given special deference and are likewise reviewed for clear error. *See Anderson,* 470 U.S. at 573, 105 S.Ct. 1504; *United States v. Saya,* 247 F.3d 929, 935 (9th Cir.2001).

Under AEDPA, a petitioner must demonstrate that the state court's adjudication of the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). AEDPA provides that state court findings of fact are presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Zichko,* 247 F.3d at 1019. Even though the state court's findings were relatively brief, we review those findings under AEDPA's usual standard. *See Downs v. Hoyt,* 232 F.3d 1031, 1035 (9th Cir.2000) (giving deference to findings of a state post-conviction court set forth in a short letter opinion coupled with a list of findings of fact).

### III. Discussion

McClure's single claim is that habeas relief is appropriate because he received ineffective assistance of counsel under the Sixth Amendment. He asserts three independent grounds on which ineffectiveness could be found. The first two are based on alleged breaches of Mecca's professional duty to maintain client confidentiality. McClure argues that this duty was breached both by a failure to obtain informed consent prior to the disclosure of confidential information and by a failure to inquire thoroughly before concluding that disclosure was necessary to prevent the deaths of the children. The third ground is that

the primacy of Mecca's concern for the victims constituted a conflict of interest that rendered Mecca's counsel constitutionally ineffective.

The overarching standard for a claim of ineffective assistance of counsel is set out in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in which the Supreme Court emphasized that a successful claim must establish both (1) deficient performance, such that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) prejudice resulting from that deficiency. *Id.* at 687, 104 S.Ct. 2052. The Court in *Strickland* noted that the Sixth Amendment "relies on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions," and that "[t]he proper measure of attorney performance" is "reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. The Court specified a limited number of "basic duties" that are essential components of reasonable performance by criminal defense counsel, including "a duty of loyalty" and "a duty to avoid conflicts of interest," but held that this list was not exhaustive and that every case will involve an inquiry into "whether counsel's assistance was reasonable considering all the circumstances." *Id.* "Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable, but they are only guides." *Id.; see also Nix v. White-side,* 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ("Under the *Strickland* standard, breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel.").

The Court has yet to "define with greater precision the weight to be given to recognized canons of ethics, the standards established by the state in statutes or professional codes, and the Sixth Amendment" in defining the proper scope of and limits on attorney conduct for *Strickland* purposes. *Whiteside*, 475 U.S. at 165, 106 S.Ct. 988. It has, however, suggested that when "virtually all of [those] sources speak with one voice" as to what constitutes reasonable attorney performance, departure from ethical canons and ABA guidelines "make[s] out a deprivation of the Sixth Amendment right to counsel." *Id.* at 166, 171, 106 S.Ct. 988.

We examine each of McClure's three assertions of deficient performance in turn.[1]

### A. The Duty of Confidentiality

McClure contends that Mecca's disclosure of McClure's confidential statements about the location of the children violated McClure's Sixth Amendment right to effective assistance of counsel. ABA Model Rule of Professional Conduct 1.6 sets forth a widely recognized duty of confidentiality: "A lawyer shall not reveal information relating to representation of a client[.]" Our legal system is premised on the strict adherence to this principle of confidentiality, and "[t]he Supreme Court has long held attorneys to stringent standards of loyalty and fairness with respect to their clients." *Damron v. Herzog*, 67 F.3d 211, 214 (9th Cir.1995). There are few professional relationships "involving a higher trust and confidence than that of attorney and client," and "few more anxiously

guarded by the law, or governed by sterner principles of morality and justice." *Id.* (quoting *Stockton v. Ford*, 52 U.S. (11 How.) 232, 13 L.Ed. 676 (1850)).

As critical as this confidential relationship is to our system of justice, the duty to refrain from disclosing information relating to the representation of a client is not absolute. The ABA Model Rule provides a list of well-established exceptions to the general principle of confidentiality, two of which are pertinent to the present case. First, a lawyer may reveal confidential information if "the client consents after consultation." Second, "[a] lawyer may reveal such information to the extent the lawyer reasonably believes necessary to prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm[.]" ABA Model Rule of Professional Conduct 1.6(b)(1) (1983). The relevant provisions of the Oregon Code of Professional Responsibility echo both the general principle of confidentiality and these particular exceptions. *See* Oregon Code of Prof. Resp. D.R. 4–101.[2]

■ The parties, apparently agreeing that these consistently recognized ethical standards provide important guidance as to whether Mecca's counsel was deficient under the first prong of *Strickland*, focus much of their dispute on the reasonableness of Mecca's actions in light of these exceptions to the general principle of confidentiality. We agree that this approach is proper. The duty of an attorney to keep his or her client's confidences in all but a handful of carefully defined circumstances

---

1. Because we ultimately hold that Mecca's performance was not constitutionally deficient, we do not reach the question of prejudice.

2. A lawyer may reveal:
 (1) Confidences or secrets with the consent of the client or clients affected, but

only after full disclosure to the client or clients.
 * * *
 (3) The intention of the lawyer's client to commit a crime and the information necessary to prevent the crime.
Oregon Code Prof. Resp. D.R. 4–101.

is so deeply ingrained in our legal system and so uniformly acknowledged as a critical component of reasonable representation by counsel that departure from this rule "make[s] out a deprivation of the Sixth Amendment right to counsel." *Whiteside*, 475 U.S. at 171, 106 S.Ct. 988. With this uncontested premise as our starting point, we examine whether the circumstances surrounding Mecca's revelation of a confidential client communication excused his disclosure, such that his performance could have been found by the state court and the district court to be constitutionally adequate. Specifically, we look to see if Mecca's client "consent[ed] after consultation" or if Mecca "reasonably believe[d] [the revelation was] necessary to prevent the client from committing a criminal act that [Mecca] believe[d][was] likely to result in imminent death or substantial bodily harm[.]" We conclude that the first of these exceptions does not apply to justify Mecca's behavior, but that the second does.

### 1. Consent After Consultation

McClure argues that Mecca rendered constitutionally ineffective assistance because he breached his duty of confidentiality by not obtaining McClure's informed consent before disclosure. The professional standard that allows disclosure of confidential communications when "the client consents after consultation" has two distinct parts: consent by the client, and consultation by the counsel. Our required deference to both the state court's factual findings and the district court's credibility determination leads us to hold that the first of these elements was met. However, despite this deference, we hold that the second element was not met.

### a. Consent

■ The state court made the following finding: "Trial counsel received petitioner's permission to anonymously disclose the whereabouts of the children to the authorities." AEDPA demands that this finding of consent be presumed correct and accepted as true unless McClure rebuts the presumption with clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). The district court, whose credibility determinations are given great weight, and whose findings of fact are reviewed only for clear error, explicitly accepted that finding, and stated that it did "not find credible petitioner's assertion that he did not consent to the disclosure of the information contained in the map." It found that McClure "voluntarily drew the map and gave it to Mecca," and that, even in the absence of the words "I consent," Mecca could infer consent from the circumstances and from McClure's conduct. It stated that it found Mecca's testimony "entirely credible and corroborated by his contemporaneous notes which state specifically that petitioner consented to the disclosure."

There is evidence in the record to cast doubt on these consent findings—indeed, enough evidence that if we were sitting as trier of fact, we might find that McClure did not give consent. McClure repeatedly denied that he consented, and certainly would have had good reason not to consent. The state court determination that McClure had consented was made before Mecca clarified that the consent was implied and not express. Moreover, it was based on Mecca's unconditional affirmative response, in his state-court deposition, to the question of whether permission to reveal the information was granted. Only later, in the federal habeas proceeding, did it come to light that Mecca had merely inferred McClure's consent.

Further, Mecca's account of the circumstances from which he inferred McClure's consent changed over the years. His initial account stated that he inferred consent

from the fact that McClure called him at home, drew the map, and gave it to him. It is a significant leap to infer McClure's consent to disclose the map to law enforcement authorities from the fact that McClure gave the map to Mecca. Virtually all clients provide information to their attorneys, but they do so assuming that the attorneys will not breach their duty of confidentiality. Further, Mecca's behavior at the time of the disclosure suggested that he thought he lacked the kind of informed consent that would give him the legal authority to act.

However, the findings reached by the state and district courts are not so "[im]plausible"—particularly in light of the district court's credibility determinations—that they produce a "definite and firm conviction that a mistake has been committed." *Easley*, 532 U.S. at 242, 121 S.Ct. 1452; *Doe*, 155 F.3d at 1074; *Phoenix Eng'g & Supply Inc.*, 104 F.3d at 1141. The district court believed Mecca's account at the evidentiary hearing, disbelieved McClure's, and found the discrepancies in Mecca's testimony to be "minor." Because there are "two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Working*, 224 F.3d at 1102. We therefore hold that McClure gave his consent to the disclosure.

### b. Consultation

■ However, the mere fact of consent is not sufficient to excuse what would otherwise be a breach of the duty of confidentiality. Consent must also be informed. That is, the client can provide valid consent only if there has been appropriate "consultation" with his or her attorney. Mecca's consultation with McClure regarding his consent to disclosure was addressed in the state court and district court findings. Both courts found that Mecca did not advise McClure about the potential harmful consequences of disclo-

sure. The state court found that "[b]efore petitioner authorized trial counsel to reveal the childrens' [sic] locations to authorities, trial counsel did not advise petitioner that if authorities located the children, he could be further implicated in the criminal activity and the evidence against him would be stronger." The district court found that "Mecca admits that he did not ... advise petitioner [of all potential adverse consequences]."

Emphasizing that McClure was "fully engaged" in his defense and that he was told that the obligation to disclose the children's location arose only if the children were alive, the district court held that "[u]nder the circumstances, Mecca's failure to advise petitioner of all possible adverse consequences was not unreasonable." We believe this holding is inconsistent with the consultation requirement because it does not attach sufficient importance to the role that an attorney's advice plays in the attorney-client relationship. It is not enough, as the district court suggests, that McClure "did not dissuade Mecca from his intentions" to share the map with authorities. The onus is not on the client to perceive the legal risks himself and then to dissuade his attorney from a particular course of action. The district court's statement that Mecca was relieved of his duty to counsel his client because "common sense dictate[d] that petitioner understood the consequences of his actions" fails to acknowledge the seriousness of those consequences and the importance of good counsel regarding them. *See Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. Even in cases in which the negative ramifications seem obvious—for example, when criminal defendants opt for self-representation—we require that a criminal defendant's decision be made on the basis of legal guidance and with full cautionary explanation. *See, e.g., Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

We disagree with the district court's conclusion that this case was so exceptional that the attorney's basic consultation duties did not apply. It is precisely because the stakes were so high that Mecca had an obligation to consult carefully with his client. In the absence of some other exception to the duty of confidentiality, his failure to obtain informed consent would demonstrate constitutionally deficient performance under the Sixth Amendment.

## 2. Prevention of Further Criminal Acts

■ The State contends that, even if Mecca did not have informed consent, his revelation of client confidences did not amount to ineffective assistance of counsel because he reasonably believed that disclosing the location of the children was necessary in order to prevent further criminal acts. That is, Mecca reasonably believed that revealing the children's locations could have prevented the escalation of kidnapping to murder. This is not a traditional "prevention of further criminal acts" case, because all of the affirmative criminal acts performed by McClure had been completed at the time Mecca made his disclosure. Mecca was thus acting to prevent an earlier criminal act from being transformed by the passage of time into a more serious criminal offense. Nonetheless, we believe that where an attorney's or a client's omission to act could result in "imminent death or substantial bodily harm" constituting a separate and more severe crime from the one already committed, the exception to the duty of confidentiality may be triggered. ABA Model Rule 1.6(b)(1).

This exception, however, requires that an attorney reveal confidences only to the extent that he "reasonably believes necessary to prevent" those criminal acts and imminent harms. *Id.* In assessing the effectiveness of McClure's counsel in light of this standard, the first step is to determine what a constitutionally effective counsel should be required to do before making a disclosure. That is, we must determine what basis the attorney had for believing that the precondition to disclosure was present, and how much investigation he or she must have undertaken before it was "reasonabl[e]" to "believ[e][it] necessary" to make the disclosure to prevent the harm. The second step is to apply that standard to the facts surrounding Mecca's decision to disclose.

There is remarkably little case law addressing the first analytical step. Citing cases dealing with a separate confidentiality exception allowing attorneys to reveal intended perjury on the part of their clients, McClure argues that a lawyer must have a "firm factual basis" before adopting a belief of impending criminal conduct. *See, e.g., United States v. Omene,* 143 F.3d 1167, 1171 (9th Cir.1998); *United States v. Scott,* 909 F.2d 488, 493–94 & n. 10 (11th Cir.1990); *United States v. Long,* 857 F.2d 436, 444–45 (8th Cir.1988). However, we are not persuaded that the perjury cases provide the proper standard.

McClure is correct that our inquiry must acknowledge the importance of the confidential attorney-client relationship and the gravity of the harm that results from an unwarranted breach of that duty. However, the standard applied in the professional responsibility code asks only if the attorney *"reasonably* believes" disclosure is necessary to prevent the crime. ABA Model Rule 1.6(b)(1) (emphasis added). Further, the *Strickland* standard likewise focuses on "whether counsel's assistance was *reasonable* considering all the circumstances." 466 U.S. at 688, 104 S.Ct. 2052 (emphasis added). Accordingly, we hold that the guiding rule for purposes of the exception for preventing criminal acts is objective reasonableness in light of the surrounding circumstances.

Reasonableness of belief may be strongly connected to adequacy of investigation or sufficiency of inquiry in the face of uncertainty. Significantly, as indicated above, *Strickland* explicitly imposes a duty on counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. 2052. In any ineffectiveness of counsel case, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* Thus, in determining whether Mecca's disclosure of confidential client information constituted ineffective assistance of counsel, we must examine whether Mecca "reasonably believed" that the precondition for disclosure existed and whether, in coming to that belief, Mecca conducted a reasonable investigation and inquiry.

The parties vigorously debate both the reasonableness of Mecca's belief that the children were alive and the reasonableness of his level of investigation and inquiry on that point. McClure argues that any conclusion that Mecca had a reasonable belief is unsupported because Mecca himself indicated that he harbored doubts as to the children's state, and yet failed to inquire further. He points to evidence in the record that Mecca, at least at some stages of his representation of McClure, did not believe the children were alive—or that he, at the least, suspected that they were dead. It is indisputable that this evidence exists, and that most of this evidence is contained in statements by Mecca himself, whom the district court found "highly credible." Mecca's notes state that, after McClure drew the map, Mecca "felt in my own mind that the children were dead, but, of course, I wasn't sure." He testified in the district court evidentiary hearing that the conclusion he came to was that, "without telling me, [McClure had] told me he had killed three people." And he stated in

this same testimony that, at the time he had his secretary place the anonymous call, he thought there was a "possibility," but not a "strong possibility," that the children were alive.

McClure argues that the statement Mecca says abruptly changed his mind about the status of the children—McClure's comment that "Jesus saved the kids"—was so vague and ambiguous that it was not a sufficient basis for a "reasonable belief" that disclosure was necessary. Despite Mecca's acknowledgment that this comment led him only to "assume" that McClure was saying the children were alive, Mecca never directly asked a question that could have confirmed or refuted that assumption. Mecca repeatedly testified that he never squarely asked about the condition of the children or whether McClure had killed them. Accordingly, McClure argues, any finding that Mecca believed the children were alive is not sufficient to establish effective assistance of counsel, because Mecca's failure to engage in a reasonable level of investigation and inquiry rendered that belief unreasonable.

Given the implicit factual findings of the state court, and the explicit factual findings of the district court, which are at least plausible in light of the record viewed in its entirety, *Phoenix Eng'g & Supply Inc.*, 104 F.3d at 1141, we disagree. The ultimate question of the reasonableness of Mecca's belief is a question of law, which we review de novo. In answering that question, however, we look to the facts and circumstances of the case, and as to these facts, we give great deference to the findings of the state court and the district court.

The district court made a number of specific findings regarding the factual basis for Mecca's belief that the children were alive. It found that only McClure

knew the true facts and that he deliberately withheld them, leading Mecca to believe the children were alive. It found that McClure controlled the flow of information, and that when Mecca informed McClure that he had an obligation to disclose the children's whereabouts if there were a chance they were alive, McClure did not tell him they were dead. It specifically rejected McClure's assertion that Mecca in fact believed that the children were dead or that he lacked information that they were alive, noting that at the time there was no evidence, other than their disappearance and the passage of time, that they had been injured or killed.

The district court also made specific factual findings regarding the nature of Mecca's investigation and inquiry. It found that "Mecca attempted to discern whether the children were alive" and "that Mecca investigated to the best of his ability under extremely difficult circumstances." McClure argues that these findings are clearly erroneous, and that "arguments that Mr. McClure was manipulative and difficult are essentially irrelevant to the lawyer's obligations." But *Strickland* holds otherwise. The *Strickland* Court emphasized that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. More specifically, it held that "what investigation decisions are reasonable depends critically" on the "information supplied by the defendant." *Id.*

This is a close case, even after we give the required deference to the state and district courts. The choices made by McClure's counsel give us significant pause, and, were we deciding this case as an original matter, we might decide it differently. But we take as true the district court's specific factual findings as to what transpired—including what McClure said

and did, and what actions Mecca took and why he took them—and we conclude that Mecca made the disclosure "reasonably believ[ing] [it was] necessary to prevent the client from committing a criminal act that [Mecca] believe[d] [was] likely to result in imminent death or substantial bodily harm[.]" ABA Model Rule 1.6(b)(1). Mecca therefore did not violate the duty of confidentiality in a manner that rendered his assistance constitutionally ineffective.

### B. Conflict of Interest

■ In addition to his claim that Mecca breached his duty of confidentiality, McClure claims that Mecca was not functioning as the "counsel" guaranteed by the Sixth Amendment because he suffered from a "fatal conflict of interest." McClure argues that Mecca was acting primarily out of concern for the welfare of possible victims rather than in his client's best interests. A conflict of interest constitutes a constructive denial of counsel altogether and is legally presumed to result in prejudice. *See Strickland,* 466 U.S. at 692, 104 S.Ct. 2052.

■ It is clear that Mecca's actions were at least partially driven by concern for the lives of the children. He forthrightly indicated as much under oath on more than one occasion. McClure suggests that Mecca's candid statements amount to "a direct admission of an actual conflict." But this is not necessarily so. *Strickland* recognizes both the "wide range of professionally competent assistance" and the need for great leeway for tactical determinations by counsel. 466 U.S. at 690, 104 S.Ct. 2052. Accepting the district court's factual findings as true, Mecca had some basis for believing that the children would be found alive if a prompt search were undertaken, and that this would be beneficial to McClure. Mecca also made an attempt to make a deal

with the State in return for the information. His testimony, which the district court regarded as highly credible, repeatedly referred to his concern that McClure's kidnapping charges could become murder charges if the children were allowed to die. The district court specifically found that Mecca "believed the disclosure could have avoided two additional aggravated murder charges and was the best strategic decision for petitioner under the circumstances," and that Mecca "sought to avoid further harm to the children *and* his client's case." (Emphasis added.) Moreover, even if Mecca was acting to preserve the lives of the children rather than to protect the interests of his client, the ethical rule requiring an attorney to act to prevent a crime means that such an action, if based on a reasonable belief, is not inconsistent with the attorney's ethically prescribed duty of loyalty.

 To prove an ineffectiveness claim premised on an alleged conflict of interest a petitioner must "establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). The client must demonstrate that his attorney made a choice between possible alternative courses of action that impermissibly favored an interest in competition with those of the client. Because McClure cannot identify specific evidence in the record that suggests that his interests were impermissibly impaired or compromised for the benefit of another party, he cannot demonstrate that his counsel "actively represented a conflicting interest." *Id.* at 350, 100 S.Ct. 1708. Without this factual showing of inconsistent interests, the conflict is merely possible or speculative. Under *Cuyler*, 446 U.S. at 350, 100 S.Ct. 1708, such a conflict is "insufficient to impugn a criminal conviction."

### Conclusion

For the foregoing reasons, we conclude that McClure did not receive constitutionally ineffective assistance of counsel. Accordingly, the district court's denial of McClure's petition for writ of habeas corpus is

AFFIRMED.

FERGUSON, Circuit Judge, dissenting:

I respectfully dissent. The majority erred when it held that the disclosure of the location of two of McClure's victims' bodies by his defense attorney did not constitute deficient performance under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). McClure's attorney, Christopher Mecca, breached one of the most sacred obligations of the attorney-client relationship, the duty of confidentiality, and in turn violated McClure's Sixth Amendment right to counsel. Based on an utterly unreasonable interpretation of the events surrounding the disclosure at issue in this case, the majority finds that Mecca met an exception to the duty of confidentiality. As a result, the majority holds that it was reasonable for Mecca to believe that two missing children were alive but dying, when he disclosed their location to authorities, without McClure's consent, without asking McClure directly whether he had killed them, and without conducting any investigation to find out.

While purportedly applying the *Strickland* standard, "reasonableness under prevailing professional norms," *id.* at 688, 104 S.Ct. 2052, the majority conducts a wholly subjective analysis of Mecca's behavior, not even attempting to define "reasonableness" or provide an objective standard by which Mecca's behavior may be judged.

By applying a subjective analysis, the majority creates an unguided test which effectively undermines the basic tenet of the duty of confidentiality embodied in the

Sixth Amendment right to counsel. In essence, the majority's rule allows a defense attorney to disclose client confidences in an alleged effort to prevent a future crime, even if:

(a) the attorney has made merely a nominal attempt to resolve his own doubts about whether disclosure is necessary and has never directly questioned his client to confirm or allay his suspicions;[1]

(b) the lawyer has virtually no evidence that the potential victims are in immediate danger;

(c) the evidence demonstrates that the attorney knew that the impending crime in question was likely concluded and was aware that her disclosure would fall so far below professional standards that it would likely result in disbarment.[2]

While defining "reasonableness" may be an elusive task, I refuse to subscribe to the majority's opinion, which provides no limitations or guidance to practitioners. Instead, I look to existing case law and our profession's ethical rules to guide my analysis in this case. Even accepting the facts as determined by the lower courts, an objective analysis of Mecca's behavior reveals that it falls below not only professional ethical standards, but also constitutional standards for effective assistance of counsel under *Strickland* and its progeny. While *Strickland* and Model Rule 1.6 supply the standard under which Mecca's conduct should be judged,[3] there nevertheless remains the difficult task of defining what behavior is "reasonable." Under either the "firm factual basis test" or even the majority's broad inquiry, Mecca's behavior fell well short of reasonably effective assistance of counsel.

### I

The notion that lawyers are obligated to safeguard a client's secrets and confidences is well established. An attorney's duty of confidentiality emanates from the profession's ethical rules, the evidentiary attorney-client and work product privileges, and the Sixth Amendment.[4] One of

---

**1.** It is important to note that this is not a case where the client informed the attorney of an impending murder or other crime involving serious bodily injury; rather, it is a case in which the criminal acts were already completed and the only question was whether the alleged victims had died as a result or were alive at the time of the disclosure.

**2.** Before making the disclosure to the authorities, Mecca told McClure's mother and sister that he could lose his license for doing so, thus revealing that Mecca was conscious that what he was planning to do was improper. Mecca now denies doing this but admits that he discussed the ethical implications of disclosure with other attorneys. In addition, the majority cites a law enforcement official's testimony relaying that, although Mecca was advised not to provide information about the children to the authorities, Mecca " 'indicated that, even though there might be sanctions, ... he still was wanting to provide information that he had regarding the children.' " Maj. Op. at 1248.

**3.** *Compare* Model Rule 1.6, "[a] lawyer may reveal ... information to the extent the lawyer *reasonably* believes necessary," Model Rule 1.6(b) (emphasis added), *with Strickland,* "[t]he proper measure of attorney performance remains simply *reasonableness* under prevailing professional norms," *Strickland* at 688, 104 S.Ct. 2052 (emphasis added).

**4.** Other ethical rules relevant to the duty of confidentiality in this case are DR 4–101 of the Oregon Code of Professional Responsibility, entitled "Preservation of Confidences and Secrets of a Client," which reads in relevant part:

(B) Except when permitted under DR 4–101(C), a lawyer shall not knowingly:
(1) Reveal a confidence or secret of the lawyer's client.
(2) Use a confidence or secret of the lawyer's client to the disadvantage of the client.
(3) Use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure.

the oldest and most sacrosanct duties of an attorney, the duty of confidentiality in the United States dates back to 1908 and the first incantation of the ethical rules for lawyers, the American Bar Association's Canons of Professional Ethics. Canon 6 provided that lawyers had an "obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences." [5] While the duty of confidentiality has evolved as our profession has evolved, the underlying principle remains steadfast: an attorney should not reveal his client's confidences without first obtaining their informed consent.[6]

The duty to guard a client's confidences is, of course, not absolute, and the ethical rules recognize as much. Because an attorney's duty of confidentiality must be balanced against the public's interest in safety and justice, Model Rule 1.6 carves out two exceptions. Both exceptions allow an attorney to disclose a client's confidences "to the extent [he or she] reasonably believes necessary," [7] either "to prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm," or "to establish a claim or defense on behalf of the lawyer" in particular controversies. The majority erroneously finds that the first exception applies in this case, thereby justifying Mecca's disclosure of the location of the bodies of two of McClure's victims, Michael and Tanya Jones.

The Supreme Court has made clear that an attorney's duty of confidentiality intersects with the Sixth Amendment right to counsel. "[The Sixth Amendment] obviously involves the right to keep the confidences of the client from the ear of the Government which these days seeks to learn more and more of the affairs of men." *Russo v. Byrne*, 409 U.S. 1219, 1221, 93 S.Ct. 21, 34 L.Ed.2d 30 (1972). As such, an attorney's unwarranted breach of the duty of confidentiality is not only an ethical violation, but also implicates the Sixth Amendment right to effective assistance of counsel.

## II

Identifying the relevant rules and governing standard is merely the first part of

---

(C) A lawyer may reveal:

. . .

(3) The intention of the lawyer's client to commit a crime and the information necessary to prevent the crime.

In addition, Oregon Revised Statute § 9.460 entitled "Duties of Attorneys," states in relevant part:

An attorney shall:

. . .

(3) Maintain the confidences and secrets of the attorney's clients consistent with the rules of professional conduct established pursuant to ORS 9.490...."

**5.** ABA Canons of Professional Ethics Canon 6, *reprinted in* CHARLES W. WOLFRAM, MODERN LEGAL ETHICS 1181 (1986).

**6.** ABA Model Rule of Professional Responsibility 1.6 reads:

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

(b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1) to prevent the client from committing a criminal act that the lawyer believes is likely to result in imminent death or substantial bodily harm; or

(2) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.

**7.** ABA Model Rule 1.6(b).

the analysis. As the majority correctly notes, the next logical step is determining what constitutes an objectively reasonable belief under the first exception to Model Rule 1.6 and for purposes of *Strickland.* In a somewhat distinct but related context, Justice O'Connor has commented that the word unreasonable "is no doubt difficult to define. That said, it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning." *Williams v. Taylor,* 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (interpreting AEDPA's requirement that a state court adjudication be "contrary to, or involve an unreasonable application of clearly established law."). Thus, the majority's failure to give meaning to the standard in this case is not excused by the inherent difficulty attached to the task.

As a general matter, Mecca's behavior should be judged against that of a "reasonable attorney." [8] In other words, what would a reasonable attorney in Mecca's position have done, if anything, with the information that McClure gave him? Framed in accordance with *Strickland* and Model Rule 1.6, was Mecca's belief that the children were alive reasonable and was disclosure reasonable under the circumstances?

 A. A "firm factual basis" is the proper standard for judging an attorney's disclosure of client confidences under the ethical rules.

The majority embarks upon an erroneous path at the outset by rejecting McClure's contention that Mecca was required to have a "firm factual basis" before disclosing the location of the children's bodies to the authorities. Maj. Op. at 1245–46. As McClure notes, both case law and current ethical standards have long required that an attorney have a substantial basis for her belief that a client plans to engage in criminal conduct, before disclosing to the authorities.[9] *See, e.g., United States v. Omene,* 143 F.3d at 1171 (stating that the court was "concerned that Omene's counsel did not lay out a firm factual basis for his position."); *United States v. Scott,* 909 F.2d 488, 493 (11th Cir.1990) (advising defendant that "he could be precluded from testifying, without confirmation that[he] intended to commit perjury . . . forced [him] to choose between two constitutionally protected rights."); *United States v. Long,* 857 F.2d 436, 445–46 (8th Cir.1988) (holding that "it is absolutely essential that a lawyer have a firm factual basis before adopting a belief of impending [criminal conduct]" by his client); *Jackson v. United States,* 928 F.2d 245, 248 (8th Cir.1991) (finding that the evidentiary hearing "provided a reasonable factual basis for believing that Jackson would lie if he took the stand.").

While the standard is primarily applied in alleged perjury cases, therefore implicating a different set of ethical rules, the

---

8. The Restatement (Second) of Torts provides that

 [u]nless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

RESTATEMENT (SECOND) OF TORTS § 299A (1965).

9. Contrary to the government's argument, the Supreme Court's decision in *Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123

(1986), does not weaken the "firm factual basis" test. Although in *Whiteside* the Court held that a defendant has no constitutional right to present perjured testimony, and thus a lawyer's refusal to facilitate a client's perjured testimony constitutes neither a breach of the professional codes nor ineffective assistance of counsel, *id.* at 176, 106 S.Ct. 988, *Whiteside* does nothing to undermine the notion that an attorney has a duty to conduct a searching inquiry before disclosing because there the client had "announced plans to engage in future criminal conduct." *Id.* at 174, 106 S.Ct. 988.

underlying principles remain the same.[10] By rejecting the "firm factual basis" standard, the majority creates the contradictory notion that the ethical rules and pertinent case law mandate a lower standard for breaching the duty of confidentiality in a manner that implicates a client in a murder, versus perjury. Nevertheless, the majority applies a totally unguided "objective reasonableness in light of the surrounding circumstances" standard. Maj. Op. at 1245.

While I am familiar with *Strickland's* mandate that we give deference to a defense attorney's choices and judgment, I do not believe *Strickland* permits the total abdication of meaningful review that the majority's analysis reflects. Our case law and ethical rules suggest a number of factors that should enter into the reasonableness calculus. First, how much information did the attorney possess suggesting that a crime was going to be committed before he disclosed? Relatedly, how much investigation did the attorney conduct to inform herself of the circumstances and resolve any doubts she may have had? Third, how convinced was the attorney that their client was going to commit a crime (for example, did he believe beyond a reasonable doubt?)?

Applying the above analysis to the case at hand, it is obvious that Mecca's chosen course of action fell short of what is required of effective counsel. Indeed, even under the majority's open ended test, a review of the *undisputed* facts reveals that Mecca failed to engage in even a minimal level of investigation before disclosing the location of the children, rendering his belief that the children were alive both illogical and unreasonable.

B. Mecca's behavior was unreasonable because he did not possess sufficient information to make his belief that the children were alive reasonable and it was unreasonable for him to rely on the little information he had.

The unreasonableness of Mecca's belief that the children were alive becomes clear by reviewing what occurred in the days leading up to the disclosure. Mecca was hired by McClure's family on Saturday, April 28, 1984. By Sunday, although McClure initially proclaimed his innocence, Mecca began to think that McClure "was involved in[Carol] Jones's murder and the disappearance of her children." This was because by this time McClure had sought Mecca's assistance in destroying evidence which McClure said might contain blood, as well as due to a meeting between Mecca, McClure and McClure's family during which it was revealed that McClure's family believed he may have been involved in

---

**10.** The perjury cases bear upon McClure's case in an interesting manner. First, as the Court noted in *Whiteside*, "the Model Code and the Model Rules do not merely *authorize* disclosure by counsel of client perjury; they *require* such disclosure." *Id.* at 168, 106 S.Ct. 988. By contrast, Model Rule 1.6 merely permits disclosure, it does not mandate it. Because it is permissive, Rule 1.6 is therefore generally more lax than the mandatory ethical rule governing client perjury. To the extent that a lawyer is required to have a "firm factual basis" that his client is going to commit perjury before disclosing, it follows logically that a comparable showing should be required of a lawyer who discloses that his

client is going to commit murder, where the stakes are substantially higher and the risk of error is that much greater.

Moreover, the difference between the crime of perjury and the crime at issue in this case, murder, is obvious and substantial. The consequences of a premature or erroneous disclosure or decision not to disclose by the lawyer are undeniably less severe in a perjury case than one involving imminent death or substantial bodily harm. Thus, a falsity or act of perjury before a tribunal, while it should in all cases be condemned, does not pose the same moral and ethical dilemmas that a crime involving substantial bodily harm does.

the crime. By Monday evening, Mecca "became convinced that petitioner had killed Carol Jones and began to question whether petitioner had killed the children[,]" due in no small part to the manner in which McClure was beginning to reveal certain information, such as his sexual fantasies about young girls and his drug use. Despite his doubts, on Tuesday, Mecca never directly inquired whether McClure had killed the children, although they specifically discussed the children that day.

Curiously, Mecca based much of his belief that the children were alive on a comment that McClure made to him on Monday, that "Satan killed Carol," but "Jesus saved the kids." Specifically, Mecca wrote in his notes that these statements hit him so abruptly, he immediately assumed that it meant the children were alive. Maj. Op. at 1237. In the face of mounting evidence pointing to the fact that the children were most likely dead, this assumption was utterly unreasonable. As Mecca himself admits, it was a hope against all hope. By Tuesday, the date of the disclosure, a reasonable attorney would have understood the complete unlikelihood that McClure spared the children, particularly after viewing the map to the bodies that McClure drew for him.

While the above is sufficient to render Mecca's belief that the children were alive unreasonable, the way in which McClure conveyed to Mecca the location of the bodies, as well as the content of the map itself, would not lead a reasonable attorney to believe the children were alive. McClure had exhibited odd behavior throughout the days preceding the disclosure, placing numerous desperate calls to Mecca from the jail and asking Mecca to dispose of crime scene evidence. When McClure finally told Mecca where the children were, he did so obscurely: in the course of discussing "places he had been with the family[,]" McClure drew a rough map, never directly telling Mecca what he would find there. The map showed two locations, which were more than sixty miles apart from one another, in a deserted and wooded area. Receiving such information after the children had been missing for eight days, although surely disturbing, is insufficient to lead a reasonable attorney to believe the children were alive and that disclosure of that information was warranted, much less necessary.[11]

The majority focuses on the fact that the District Court found that "McClure knew the true facts and he deliberately withheld them, leading Mecca to believe the children were alive[,]" noting that McClure "controlled the flow of information." Maj. Op. at 1247. However, this does not change the fact that Mecca had very little information on which to base his belief and the little he had overwhelmingly and sadly pointed to the children's demise.

C. Mecca's conduct was unreasonable because, in the face of almost no information supporting his belief, Mecca conducted no investigation to verify his belief that the children were still alive.

Faced with almost no information to support his wishful thinking, Mecca compounded his error by conducting virtually no investigation about the children. The majority cites the District Court's findings that Mecca " 'attempted to discern whether the children were alive' and 'that Mecca investigated to the best of his ability under extremely difficult circumstances.' " *Id.* at 1247. However, neither the District Court nor the majority ever identify what steps Mecca took to inform himself of the condi-

---

11. Even the investigating officer, Undersheriff Carlton, testified in his deposition that the authorities "were faced with the likelihood that the children were dead, but we did not know that."

tion of the children. This is because Mecca did not conduct any investigation whatsoever. The fact of the matter is that by the time Mecca disclosed the location of the children's bodies, enough had transpired between himself, McClure's family, and McClure that a reasonable attorney would not have reasonably believed the children would be found alive.

Mecca never directly asked McClure whether he had killed the children. Why Mecca did not do so is unexplainable. It could not have hurt McClure's case had he answered in the affirmative; that information would certainly have been covered by the attorney-client privilege. The closest Mecca came to asking McClure was when Mecca advised him that they were obligated to disclose the location of the children if there was any possibility that they were alive, to prevent a possible assault from becoming murder. McClure did not respond. To infer that they were alive from McClure's silence is illogical. In fact, a reasonable person would most likely have inferred that there was no possibility that the children were alive, because McClure had just been informed that he was required to disclose if there was.

Besides directly inquiring with McClure, Mecca could have also conducted some investigation outside of the jail cell. Mecca could have armed himself with the map and driven to the locations on the map to determine once and for all if the children were alive. Moreover, both Mecca and McClure testified that they discussed the option of Mecca doing so; why Mecca chose not to and instead went to the authorities is beyond reason. Indeed, if he truly believed the children were alive in the woods, at risk of exposure and starvation, it is inexplicable that he would not have immediately gone to assist them. While locating the bodies himself would undeniably have been a great burden, criminal defense attorneys should be prepared to meet the myriad challenges of their vocation—investigating and uncovering disturbing evidence related to their representation is but one; confronting moral and ethical dilemmas competently is another.

D. Mecca's conduct was unreasonable because Mecca had no more than a bare suspicion, based entirely on his own wishful thinking, that the children were alive.

Mecca purportedly believed the children were alive; however, his words and actions at the time of the disclosure indicate that his belief was pallid. Since Mecca testified in hindsight about his belief that the children were alive, the majority emphasizes the lower courts' credibility determination in favor of Mecca. Even accepting that veracity of Mecca's belief, examining the strength of that belief betrays the government's assertions that it was reasonable. It is true that Model Rule 1.6 does not indicate what is required beyond a "reasonable belief[,]" but surely an inkling alone cannot suffice to support a reasonable belief.

The majority omits a number of undisputed facts about the events leading up to Mecca's disclosure that show Mecca was not as certain about the children's vitality at the time of the disclosure as he is today. First, Mecca repeatedly used the word "bodies" when referring to the children in his notes taken shortly after the disclosure. For example, Mecca wrote: " 'McClure related to me ... one place where a body might be' and then 'described [where] the other body would be located.' " Maj. Op. at 1236. Additionally, Mecca recorded the following after the prosecutor had refused to negotiate a plea for McClure: " 'The only option I had, as far as I was concerned, was to disclose the whereabouts of the body [sic].' " Id. at 1237. Mecca also wrote, " 'I arranged to

have the information released anonymously to the Sheriff's Department with directions to the bodies.' " *Id.* at 1237. Although Mecca attempted to explain his choice of words by explaining that he made the notes after the bodies were located, this answer is unsatisfying.

Examining Mecca's mental state around the time of the disclosure is also illuminating. After his conversation with McClure on Monday, Mecca testified, " '[t]he conclusion I came to was that, without telling me, he told me he had killed three people.' " *Id.* at 1238. When discussing McClure's comment that " 'Satan killed Carol, but Jesus saved the kids[,]' " Mecca stated that he " 'kind of felt that[McClure] was talking about a sexual thing, but, in any event, [he] wasn't sure.' " *Id.* at 1237. In addition, Mecca stated the following regarding the Jesus/Satan comment: " 'I allowed myself to believe that these kids might somehow be alive.' " *Id.* at 1239. Mecca's own words suggest the absurdity of this belief—he *allowed* himself to believe it because it was so incredulous. Finally, Mecca practically admitted that his belief was weak in discussing the possibility that the children were alive. He testified that he " 'felt it was a possibility. I wouldn't say a strong possibility.' " *Id.*

Finally, Mecca attempted to negotiate a deal with the prosecution in exchange for the information about the children's bodies. If Mecca strongly believed the children were alive but dying, and his concern for their welfare was as great as he claims, why would he continue to jeopardize their lives by first trying to strike a deal for his client?

While it is true that the events leading up to Mecca's disclosure unfolded rapidly and were no doubt incredibly stressful, it is not unfair to expect a reasonable criminal defense attorney to be capable of competently dealing with these types of situations. It was not such a brief period of time [12] that Mecca's lack of investigation and rash disclosure can be justified. In short, Mecca had agreed to represent an individual who was accused of killing a woman whose children were missing. Over the course of a few days, McClure revealed himself to be a mentally disturbed individual who fantasized about sex with young girls and enlisted his attorney's help in destroying evidence related to the murders. Perhaps Mecca is correct that there was no way to be 100% certain at the time whether the children were alive or dead, and perhaps we should not question whether he truly personally believed that the children were alive. But as a criminal defense attorney, Mecca had a responsibility to inform himself, investigate, and support his belief by facts before taking the extreme step of disclosing McClure's confidential information to the police. When an attorney falls below this standard, courts should not be afraid to name the problem: deficient performance under the Sixth Amendment guarantee of effective assistance of counsel.

In the end, it is clear that not only did Mecca lack a "firm factual basis" for his belief that the children were alive, he had virtually no basis whatsoever, nor did he make a reasonable effort to gain one—at best, Mecca's "investigation" can be characterized as paltry. The danger of the majority's decision is that it risks making Mecca's conduct the standard for attorneys who may find themselves in a similar predicament in the future.

### III

I too sympathize with Mecca for being concerned with the welfare of the children,

---

**12.** Mecca represented McClure for three days before he made the disclosure. During this period, they met seven times and spoke via telephone numerous times.

as do the majority, the District Court and the state court. It would scarcely be wrong to criticize him for, as the District Court stated, being "a human being." However, because at the time of the disclosure Mecca was playing a critical and unique role as McClure's defense attorney, I cannot sanction his behavior. It seems that the time has come for Mecca to take responsibility for the choice he made to breach his client's confidence and for a court, *this court*, to recognize that whether or not Mecca did the "right" thing does not diminish the fact that his doing so constituted an abdication of his professional duties and rendered his performance as McClure's defense attorney deficient under the Sixth Amendment. Mecca's concern for the children is certainly understandable and laudable, however, it does not negate the infirmity of McClure's conviction. Therefore, I must dissent.