In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 11-1002, 11-1012

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CORVET T. WILLIAMS and BRIAN D. AUSTIN,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
Nos. 06 CR 50055-1, -2—**Frederick J. Kapala**, *Judge*.

ARGUED APRIL 10, 2012—DECIDED SEPTEMBER 11, 2012

Before POSNER, ROVNER, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. Corvet Williams and Brian Austin were tried together for armed bank robbery and use of a firearm in a crime of violence, 18 U.S.C. §§ 2113(a), (d), 924(c)(1)(A), and were convicted by a jury. Their convictions were reversed, 576 F.3d 385, on a ground unrelated to the present appeals. They were retried, again convicted by a jury, and each sentenced to 684 months

in prison. They appeal, challenging both their convictions and their sentences.

There were two robberies, two weeks apart, pretty obviously committed by the same two persons—so similar were the modus operandi of the robbers on the two occasions: two black men, one short and one tall, both brandishing pistols and wearing black gloves plus masks that covered the head completely except for eyes and mouth, with the shorter of the two men jumping over the teller counter to get the money while the taller pointed a silver-colored semi-automatic handgun held in his left hand at bank employees and customers, whom he had ordered to lie on the floor. And in each robbery the robbers had driven a stolen vehicle to the bank, left it with its motor running while they robbed the bank, and after the robbery driven away in another stolen vehicle, parked nearby.

Austin challenges his conviction on the ground that the evidence was insufficient to convict him beyond a reasonable doubt. That is the only challenge mounted by his lawyer. We permitted Austin to file a pro se brief complaining about the adequacy of his lawyer's representation of him at the second trial, but that complaint has insufficient merit to warrant our extending this opinion to discuss it.

The principal witness against Austin (as against Williams) was Edward Walker, who testified that he'd been the getaway driver for the second robbery and so knew who the robbers were—and they were, he testified, his old friends Austin and Williams. He also testified that

earlier those two had explained to him that they would be using two stolen cars in the robbery and Austin had told him that he had committed a previous robbery with Williams, also using two stolen vehicles. Another witness—Austin's former girlfriend, with whom he'd broken up a couple of months before the robberies—testified that she had recognized him in the surveillance photos of the second robbery despite the mask.

Austin told the police when arrested that he had an ironclad alibi for the second robbery—he had been having a haircut while the bank was being robbed. But testimony by the barber, corroborated by phone records, placed the haircut an hour after the robbery. Another former girlfriend of Austin—his girlfriend at the time of the robberies—testified that Williams and Austin had been together in her apartment the morning of the robbery, before it occurred, and had left together.

Austin denied having participated in either robbery, but also testified that his hair had been cut at noon the day of the second robbery—which was 80 minutes after the robbery—and admitted that he'd been in his girlfriend's apartment with Walker and Williams that morning.

He argues that the girlfriend who claimed to have recognized him in the surveillance photos could not have done so because of the mask, that she had testified against him out of spite, and furthermore that she already knew he was a suspect when she identified him from the photo. And he argues that Walker's testimony should be disbelieved because Walker had been

given immunity from prosecution in exchange for his testimony and therefore incurred no cost by implicating himself along with the defendants.

There was no evidence that the ex-girlfriend had testified out of spite—on the contrary, the evidence was that she had testified reluctantly. (No explanation was offered for why they'd broken up.) Although the mask covered Austin's head almost completely, her testimony that she recognized him from the shape of his body and how he moved was not implausible, as she had known him for 18 years. (Had she not known him so well, there might be grave doubts about the reliability of her face-obscured identification. See A. Mike Burton et al., "Face Recognition in Poor-Quality Video: Evidence from Security Surveillance," 10 *Psychological Science* 243, 245-48 (1999).) The identification was not suggestive, because she was shown just the surveillance photos and asked only whether she could identify the masked man; she was not told that the police thought it was Austin, and he had not yet been arrested. It's true that the police had searched her apartment the day of the second robbery. But her roommate was Williams's girlfriend at the time, and Williams had stayed in the apartment the night before, and we have no reason to think that Austin's ex-girlfriend connected the search with Austin rather than with Williams.

Walker's testimony against the defendants was self-serving, of course, but it was corroborated. The defendants' argument that it was contradicted by neutral witnesses is incorrect; there were some discrepancies in

witnesses' testimony as there almost always are, but they were minor.

Austin did not make a wise choice in deciding to testify. He made crucial admissions, which when added to the ex-girlfriend's testimony, Walker's testimony, the testimony of Williams's girlfriend, and the barber's testimony entitled a reasonable jury to conclude that he was guilty beyond a reasonable doubt. And it is the cumulative probability of guilt created by all the evidence, rather than the probability of guilt created by a single piece of evidence, that is the touchstone in deciding whether a reasonable jury could find the defendant guilty beyond a reasonable doubt. *United States v. Duarte*, 950 F.2d 1255, 1260 (7th Cir. 1991); *United States v. Carson*, 702 F.2d 351, 362 (2d Cir. 1983). Suppose the prosecution submits three items of evidence of the defendant's guilt (and the defendant submits no evidence of his innocence), and the probability that item 1 is spurious is 10 percent, the probability that item 2 is spurious is also 10 percent, and likewise item 3. The probability that all three are spurious (assuming that the probabilities are independent—that is, that the probability that one piece of evidence is spurious does not affect the probability that another is), and therefore that the defendant should be acquitted, is only one in a thousand (.1 x .1 x .1). There is an analogy to calculating the risk of dying of some disease. Suppose the probability of finding oneself in a locale where the disease is common is 10 percent, the probability of catching the disease if one is in that locale is also 10 percent, and likewise the probability of dying if one catches it. The probability

that one will die from the disease is again only one in a thousand. So the fact that there were infirmities in all the items of evidence against Austin does not indicate that the probability of his guilt fell short of the required threshold, which is proof beyond a reasonable doubt, implying a very high probability of guilt, though there is no agreement on what "very high probability" means in percentage terms in this context.

If the evidence against Austin was adequate, as we have just seen that it was, the evidence against Williams was overwhelming. The police stopped a vehicle a few hours after the second robbery. In it were Williams and his girlfriend. The police found bait bills from the robbed bank in the girlfriend's purse. In addition, Williams was wearing muddy shoes and their tread matched footwear impressions left by one of the bank robbers; also the shoes were stained with a dye that was the color of the jumpsuit worn by the taller of the two robbers—Williams. And he admitted having testified in a previous proceeding to owning a chrome (and thus silver-colored) .25 caliber semi-automatic handgun, and such a gun was seized by police from the apartment of Williams's girlfriend, where he had stayed the night before the robbery. Austin's ex-girlfriend, who remember was the roommate of Williams's girlfriend, identified the gun as Williams's. There was additional evidence of his guilt, such as Walker's testimony.

Williams contends, however, that the government impermissibly bolstered its case by calling his original lawyer as a witness. The lawyer testified that Williams

had mailed him an envelope marked "legal mail" (so that it would not be opened by the jail) that contained a sealed letter addressed to a cousin of Williams and a note asking the lawyer to forward the letter to Williams's family to give to the cousin. The lawyer was suspicious and read the letter. It instructed the cousin to provide an alibi for Williams by testifying that Williams had been involved in a marijuana deal on the day of the robbery. Realizing that Williams was trying to obstruct justice by asking the cousin to provide him with a false alibi, the lawyer did not forward the letter. Instead, with the judge's permission the lawyer withdrew as Williams's counsel, turned the letter over to the government, and agreed at the government's request to testify at Williams's trial. He testified that the letter was a "blatant attempt to get me involved in smuggling something out of the jail that in turn would be a potential instrument for obstruction." Williams, who like Austin had decided to testify, admitted on the stand that his aim in writing the letter had indeed been to induce his cousin to lie for him.

He argues that his lawyer did a terrible thing in turning against him as he did; indeed that the lawyer violated the Sixth Amendment right to effective assistance of counsel; and that the impact on the jury of the lawyer's testimony must have been devastating. These are separate points and we shall discuss them separately.

There was no violation of the lawyer-client privilege. In asking the lawyer to forward the letter Williams was

not soliciting legal advice or providing information that the lawyer might use in crafting Williams's defense. "When information is transmitted to an attorney with the intent that the information will be transmitted to a third party…, such information is not confidential." *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983). For "an individual cannot purchase anonymity by hiring a lawyer to deliver his money or his messages." *In re Grand Jury Subpoena*, 204 F.3d 516, 522 and n. 5 (4th Cir. 2000).

The ethical rule applicable when the lawyer turned against Williams was the rule of the Northern District of Illinois that permitted a lawyer to "reveal . . . the intention of a client to commit a crime," N.D. Ill. L.R. 83.51.6(c)(2), although it did not require him to do so unless "it appear[ed] necessary to prevent the client from committing an act that would result in death or serious bodily harm." *Id.* at 6(b). Oddly, the parties do not cite that rule, but instead the Northern District's current rule, adopted in 2011, which, we are surprised to discover, is less protective of public safety. It permits a lawyer to reveal information relating to the representation of a client *only* in specified circumstances, such as "to the extent the lawyer reasonably believes [that revelation is] necessary (1) to prevent reasonably certain death or substantial bodily harm; (2) to prevent the client from committing a crime or fraud that is reasonably certain to result in substantial injury to the financial interests or property of another and in furtherance of which the client has used or is using the lawyer's services; [or] (3) to prevent, mitigate or rectify substantial injury to the financial interests or property

of another that is reasonably certain to result or has resulted from the client's commission of a crime or fraud in furtherance of which the client has used the lawyer's services." ABA Model Rule of Professional Conduct 1.6(b)(1)-(3). The new Northern District rule adopts the ABA Model Rules of Professional Conduct. N.D. Ill. L.R. 83.50. But the current rule is not applicable to this case. The old Northern District rule—the rule applicable to this case—placed no limitations on a lawyer's reporting the intention of his client to commit a crime.

And more than an *intention* was involved. Williams had already committed the crime of attempting to suborn perjury by preparing the letter to his cousin and asking the lawyer to forward it, and he intended the further crime of actually suborning perjury. An unfulfilled intention to commit or suborn (that is, get someone else to commit) perjury is not a crime, but the intention plus a significant step toward completion, which Williams took, is a crime. And there is more than just suborning perjury in this case, because the cousin would have committed perjury had he agreed to Williams's request, as would Williams had he testified to the false alibi. So we're really talking about three crimes, one completed, two intended: suborning perjury; perjury by Williams; and perjury by the cousin. (The lawyer would have suborned perjury too had he delivered the note to the cousin after reading it, but that was never in the cards.)

The literature on the ethical duties of lawyers counsels that a lawyer should attempt to dissuade his client from illegal conduct before disclosing his client's inten-

tions to the court or to law enforcement authorities. But the literature phrases this as a recommendation rather than as a flat command, frequently hedging it with qualifications such as "ordinarily" and "practicable." See, e.g., *Restatement (Third) of Law Governing Lawyers* § 120, comment g (2000); 2 Geoffrey C. Hazard & W. William Hodes, *The Law of Lawyering* § 29.21 (3d ed. 2011); ABA Model Rule 1.6, comment 14; ABA Model Rule 3.3, comment 6. This makes sense in the usual case; the harm to the client's interests and to the attorney-client relationship from disclosure is great, and the benefit of disclosure in preventing criminal activity is usually small when the crime is perjury since the lawyer can refuse to introduce the perjured testimony. But this is not the usual case. Had Williams's lawyer merely refused to forward the letter, Williams might have found a different means of conveying his unlawful request to his family (maybe orally in jail to a visiting family)—perhaps with instructions to find someone other than the cousin to be the false alibi witness, someone the lawyer had never heard of and therefore would have no basis for refusing to call as a witness. Facing a possible sentence of more than 50 years for the bank robberies and having already attempted to suborn perjury, Williams was unlikely to hearken to an ethics lecture by his lawyer.

This was not a case in which a client tells the lawyer that he would like to give testimony that the lawyer knows is a lie, and the lawyer tells him he must not do so and is confident the client will obey. Williams took a substantial step toward procuring a false witness and having embarked on that course had other means

of reaching his destination even if the lawyer prevented the cousin from testifying. In such a case a lawyer is allowed to exercise discretion concerning whether to withdraw from representing the defendant and report the defendant's crime of attempting to suborn perjury.

More important than what we think is that allowing the exercise of such discretion is consistent with the Northern District's (old) rule of lawyer conduct, the rule applicable to Williams's lawyer, which authorized the lawyer to "reveal…the intention of a client to commit a crime." Even ABA Model Rule of Professional Conduct 3.3(b), which the Northern District has now adopted, states, albeit in tension with the other one of the model rules that we quoted, that "a lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal." And in *Nix v. Whiteside*, 475 U.S. 157, 169 (1986) (emphasis added), the Supreme Court said that "it is universally agreed that *at a minimum* the attorney's first duty when confronted with a proposal for perjurious testimony is to attempt to dissuade the client from the unlawful course of conduct." In other words, the lawyer's *minimum* duty to the court—to the law—is to try to dissuade his client from committing perjury. The maximum would be to withdraw and testify against him. And the Court in *Nix* (like the other authorities on professional ethics on which William does or could rely) was dealing with a case in which a crime (perjury) had merely

been proposed, rather than, as in this case, with a crime (attempted subornation of perjury) that had already been committed.

That is not a trivial distinction. "In tort law, unsuccessful attempts do not give rise to liability . . . . The criminal law, because it aims at taking dangerous people out of circulation before they do harm, takes a different approach. A person who demonstrates by his conduct that he has the intention and capability of committing a crime is punishable even if his plan was thwarted." *United States v. Gladish*, 536 F.3d 646, 648-49 (7th Cir. 2008). Williams is different from the client who merely proposes perjury, because his substantial step towards the crime "makes it reasonably clear that had [he] not been interrupted or made a mistake . . . [he] would have completed the crime." *Id.*

The Supreme Court in *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009), criticized courts of appeals not only for relying on ABA guidelines that post-dated the relevant conduct but also for treating the guidelines "not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands." Lawyers enjoy a broad discretion in responding to litigation misconduct by their clients, and in the unusual circumstances of this case we do not think the lawyer acted unethically.

Even if he did, it would not follow that his testimony was inadmissible, unless otherwise barred by the Federal Rules of Evidence, for example because deemed unduly prejudicial in relation to its probative value. Fed. R. Evid. 401. Exclusionary rules, which protect the guilty,

are no longer favored. "Suppression of evidence . . . has always been our last resort, not our first impulse. The exclusionary rule generates substantial social costs which sometimes include setting the guilty free and the dangerous at large." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006); see also *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 343-50 (2006); *Trammel v. United States*, 445 U.S. 40, 50-51 (1980). "Only communications subject to the attorney-client privilege cannot be disclosed under judicial compulsion," *Newman v. State*, 863 A.2d 321, 332 (Md. 2004)—and the privilege doesn't extend to a client's asking his lawyer to help him commit a crime. See also *United States v. Zolin*, 491 U.S. 554, 563 (1989); *In re Grand Jury*, 475 F.3d 1299, 1305-06 (D.C. Cir. 2007).

Rejection of an exclusionary rule does not mean that there is no remedy for misconduct by a lawyer. Defendant Williams—or for that matter a judge of this court—can complain to the local bar association about the conduct of his original lawyer. Lawyers are subject to professional discipline up to and including disbarment, and the threat of discipline should deter willful violations. The reason for an exclusionary rule is not to make the defendant whole by putting him back in the position that he would have occupied had it not been for the violation. Exclusionary rules exclude improperly obtained evidence that often is highly probative of guilt. That is true in this case. And rather than being a victim deserving a remedy, Williams is a confessed attempted suborner of perjury.

Exclusionary rules should be reserved for cases in which there is no alternative method of deterrence. Pro-

fessional discipline is an alternative. True, one can imagine a case in which the defendant's former lawyer, having retired from practice and thus no longer being subject to professional discipline, offers to testify for the prosecution about client confidences. But in that case, either his testimony would be barred by attorney-client privilege or, if not, he could be compelled to testify under subpoena. ABA Model Rule 1.6, comment 13 ("lawyer may be ordered to reveal information relating to the representation of a client by a court").

In this case, the lawyer's testifying to his former client's effort to enlist him in suborning perjury could not have violated Williams's constitutional right to effective assistance of counsel. The lawyer was no longer Williams's counsel when he testified; he had withdrawn as counsel and his right to do so is not questioned. Williams does not accuse the lawyer who represented him at trial (his original lawyer having withdrawn by then) of having rendered ineffective assistance of counsel. We can't find any authority for holding that a lawyer's actions after withdrawing from a litigation can give rise to a claim of ineffective assistance by a party he formerly represented—especially since, as just noted, a lawyer may be ordered to reveal information relating to the representation of a client by a court. If we ordered a new trial, the government could subpoena the lawyer to testify again.

And if all this is wrong and there was error in allowing the lawyer to testify, it was harmless because the other evidence against Williams was overwhelming.

*Strickland v. Washington*, 466 U.S. 668, 694 (1984). An error in a criminal case in which the defendant is convicted by a jury is harmless if without the error no *reasonable* juror would have voted to acquit. This is such a case. Although the eyewitness identification of Williams was not conclusive, if only because Williams was masked, the other evidence against him—the money, the shoes, the gun—constituted overwhelming evidence of guilt. Having convicted Austin on weaker though adequate evidence in an error-free trial, how could the jury in reason have acquitted Williams? Even when there is a denial of the constitutional right to effective assistance of counsel in a criminal trial, the rule of harmless error applies. The right to effective counsel protects a defendant from the risk of false conviction. "Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence." *Gideon v. Wainwright*, 372 U.S. 335, 345, (1963), quoting *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932). There is no risk that Williams was convicted falsely.

The jury may not even have given much weight to the lawyer's evidence; the fact that a criminal defendant facing a long sentence tries to get a relative to give him a false alibi is not conclusive evidence of guilt of the crime the defendant is being tried for—an innocent person, fearing that he would be convicted because the weight of the evidence was against him, might in desperation try such a ploy. That would be criminal, and an admitted willingness to commit another crime (remember that Williams admitted he'd attempted to obtain a false alibi from his cousin) could only hurt

the defendant, but not necessarily critically, and not critically in this case in any event, because of the weight of the other evidence against him.

It's true that the prosecutor *said* that the lawyer's testimony was "essential" to its case. It wasn't; it was an example of conduct by prosecutors that we have criticized in *United States v. Ford*, 683 F.3d 761, 767-68 (7th Cir. 2012): prosecutors tend to pile on evidence of dubious admissibility or probative value even when the probative admissible evidence is overwhelming because they want to guarantee a conviction and they know that even though no reasonable jury could acquit in the face of the probative admissible evidence, not all juries are reasonable.

Which means that the government should not have called the defendant's former lawyer as a witness against his former client. The fact that it *was* his former lawyer testifying against him was likely to have a greater impact on the jury than the contents of his testimony warranted, since the contents were as we said not necessarily inconsistent with innocence. The prejudice was great in relation to the limited probative value, so the judge should have excluded the testimony under Rule 401. But a harmless error is not a permissible basis for reversing a conviction (which is why prosecutors pile on!).

The defendants complain finally about the length of their sentences. A sentence of 684 months—57 years—in a criminal justice system in which parole has been abolished is extraordinarily severe; the defendants were in

their late 20s when sentenced, so in all likelihood will spend the rest of their lives in prison. But the only ground on which they challenge their sentences is that the judge was being vindictive in imposing them. The original sentences had been 646 months for Williams (the bottom of the applicable guidelines range) and 648 months for Austin (two months above the bottom). The judge in the second trial added 38 months to Williams's sentence and 36 months to Austin's, still within the guidelines range, which tops off at 711; but 684 months was the statutory maximum, and so the judge couldn't go any higher.

When a judge imposes a heavier sentence on retrial than he'd imposed in the first trial and no legitimate reason for the heavier sentence is offered, a suspicion arises that the judge gave the heavier sentence because he was angry at the defendant for having appealed and gotten the judgment reversed and forced the judge to sit through another trial of the same charges. The Supreme Court has held that when the circumstances of the second sentencing "pose a realistic likelihood of 'vindictiveness,'" the defendant is entitled to be resentenced unless the court is able to offer a legitimate justification for the higher sentence. *Blackledge v. Perry*, 417 U.S. 21, 27 (1974); see also *Wasman v. United States*, 468 U.S. 559, 563-65 (1984).

But in this case the original sentences were imposed by a different judge, so the fact that the sentences at the retrial were heavier does not give rise to an inference of vindictiveness. *Texas v. McCullough*, 475 U.S. 134, 140

(1986); *United States v. Cheek*, 3 F.3d 1057, 1064 (7th Cir. 1993). The *Booker* decision restored the sentencing discretion that the Sentencing Guidelines had removed, and the result is that different federal judges not infrequently give significantly different sentences for the same criminal conduct. Federal judges are now permitted to have their own penal theories, *Spears v. United States,* 555 U.S. 261, 265-66 (2009) (per curiam); *United States v. Aguilar-Huerta,* 576 F.3d 365, 367 (7th Cir. 2009), and different penal theories are apt to generate different sentence lengths. The district judge who imposed the second sentences expressed particular concern, not inappropriately, with the defendants' use of masks, which could greatly increase the difficulty of proving guilt; his predecessor had not mentioned the masks.

The defendants argue that the judge's vindictiveness is evidenced by his having given the two defendants identical sentences despite the "unique circumstances" of each. (The first judge had given Austin a slightly higher sentence on the ground that he had played a bigger role in planning the robberies.) But perhaps because the defendants, though represented by different lawyers, filed a single opening brief and a single reply brief, they have never specified the differences between the defendants' culpability that might have compelled a reasonable judge to give their clients different sentences. It would of course be awkward for a brief filed on behalf of both to argue that one should be given a shorter sentence than the other—and if they were given different sentences one sentence would have to be

shorter than the other. The lawyers should have filed separate briefs with regard to the sentences.

The judgments are

AFFIRMED.

HAMILTON, *Circuit Judge*, concurring in part and dissenting in part. I agree that the evidence was sufficient to support the convictions of both Williams and Austin and that the district judge did not err in sentencing. I concur in those portions of the court's opinion and in the judgment affirming Austin's conviction and sentence.

I respectfully dissent from the affirmance of Williams's conviction. For our adversarial system of criminal justice to function, a defendant must have one person who is zealously acting in his interests — his defense lawyer. Criminal defense lawyers have many duties. Those duties include trying to save their clients from their own folly, especially as they face an intimidating and even frightening criminal justice system. If the lawyer's first response to an idea like Williams's false alibi can be to disclose that information to the court and prosecutor, we will erode the confidence that accused clients should have in their lawyers. In the long run, we will undermine the ability of those lawyers to represent their clients effectively.

Williams was denied the effective assistance of counsel when his original lawyer breached his professional duties of loyalty and confidentiality and then became a witness against him without objection from his new trial counsel. Although the question of prejudice is a close one, I would remand for a new trial. The prosecution itself has described the original lawyer's testimony as "essential" to its case against Williams, and the testimony let the prosecutor force Williams to admit fifteen times that the contents of the letter he gave to the lawyer were lies. I address first the performance prong of *Strickland v. Washington*, 466 U.S. 668 (1984), explaining the original lawyer's breach of his duties of loyalty and confidentiality and turning then to trial counsel's failure to object to the original lawyer's testimony. I conclude with the prejudice prong of *Strickland* and the results of the failure to provide effective assistance of counsel.

I.  *The Performance Prong — Loyalty and Confidentiality*

Defendants facing criminal charges often come up with stupid, even criminal, ideas to try to beat the charges. Their lawyers often learn of these stupid ideas. Williams fit right into that pattern when he gave his first lawyer, Dennis Ryan, a sealed letter for his cousin asking for support for a false alibi. Ryan was properly suspicious. He opened the letter and realized that Williams was trying to use him as a messenger to help concoct a false alibi.

Any lawyer who has had a dishonest or unethical client, and just about any experienced criminal defense lawyer, can appreciate the problem here. Ryan was upset and offended, and he decided to withdraw from the case. Ryan had that right, but the problem is *how* he did so. Without talking with his client, his first action was to file in court a motion to withdraw supported by his own affidavit fully explaining the circumstances. Making matters much worse for his client, he failed to obtain court permission to file his motion under seal, and thus gave the prosecutor full access to the motion and the affidavit, and eventually to the letter. In my view, the result was a breach of his professional duties of loyalty and confidentiality to his client, and a failure to act as the counsel that the Sixth Amendment promises.

### A.  *Strickland and Professional Standards*

Before explaining just how the lawyer breached his duties of loyalty and confidentiality, let's look at the connection between professional standards and the Sixth Amendment right to counsel. To show a violation of his right to counsel, the performance prong of *Strickland v. Washington* requires Williams to show that his lawyers performed seriously below professional standards and that their failures prejudiced him. 466 U.S. at 687. The constitutional standard is "reasonableness under prevailing professional norms." *Id.* at 688.

*Strickland* and the Sixth Amendment right to counsel do not constitutionalize all the rules of professional conduct and the applicable commentary, but those stan-

dards provide valuable guidance. "Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ('The Defense Function'), are guides to determining what is reasonable, but they are only guides." *Id.* at 688; see also *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010) (applying "weight of prevailing professional norms" to hold that criminal defense attorney provided ineffective assistance by failing to advise client that guilty plea would make client subject to automatic deportation; standards are "only guides," not "inexorable commands," but "may be valuable measures of the prevailing norms of effective representation"); *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009) (faulting court of appeals for using ABA guidelines that post-dated the relevant conduct and treating them "not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands").

*Strickland* specifically mentions the duty of loyalty, 466 U.S. at 688, and as part of the "overarching duty to advocate the defendant's cause," the constitutional standard surely includes the duty of confidentiality unless there is a powerful reason to make a disclosure of a confidence. In a case presenting a conflict between duties to a client and duties to a court, the Supreme Court relied heavily on the American Bar Association's Model Rules of Professional Conduct, which had been widely adopted at that point, and the official commentary and scholarly writing on the problem, particularly where "virtually all of the sources speak with one voice." *Nix v. Whiteside*, 475 U.S. 157, 166 (1986);

accord, *McClure v. Thompson*, 323 F.3d 1233, 1241-43 (9th Cir. 2003) (making this point while holding that lawyer did not breach constitutional or professional standards by giving police the locations of kidnapped children he feared were dying and needed rescue). In this case, virtually all sources speak with one voice with respect to two key failures by Williams's original lawyer.

### B. *Clients With False Defenses*

The problem the lawyer faced — a client who wants to concoct a false alibi or other defense — is not rare. The governing professional standards have been developed and applied for generations. Must the lawyer remain silent? May he disclose the client's plan? Must he disclose it? May or must the lawyer withdraw? The boundaries between disclosures that are prohibited, permitted, or required have always been controversial and changing. See generally 2 Hazard & Hodes, The Law of Lawyering § 29.2 (3d ed. 2011) ("The situations treated in Rule 3.3 entail the most severe tension between duties to a client and duties to the tribunal.").

As we'll see, though, there is a clear professional consensus on two central points. First, before a lawyer discloses the client's confidences, the lawyer has an obligation, where practicable, to try to convince the client to change course. If the persuasion is not successful and the lawyer seeks to withdraw, the lawyer may or may

not have to disclose the reasons for doing so. If the lawyer decides or is required to disclose the client's confidences, the second point of consensus is that the lawyer has an obligation to do so in a way that minimizes harm to the client. Lawyer Ryan failed to adhere to both of these standards and denied Williams the effective assistance of counsel.

The key provisions in the modern rules of professional conduct are Rule 1.6 on the duty of confidentiality and Rule 3.3 on the duty of candor to a tribunal. The history of those rules and their predecessors shows shifting standards on when a lawyer may or must disclose a client's confidential information. Older standards of what is now Rule 1.6 permitted disclosure only to prevent reasonably certain death or substantial bodily harm. Exceptions were later added to prevent fraud that is reasonably certain to cause substantial financial injury, and, in perhaps the broadest formulation, to prevent "a crime." That broadest formulation is the standard that applied in the Northern District of Illinois when Ryan was representing Williams. See Northern District of Illinois, Rules of Professional Conduct, Local Rule 83.51.6 (effective Sept. 1, 1999, including amendments through Apr. 1, 2006). Under the rules in effect in 2007, lawyer Ryan did not have a professional duty to remain silent when he realized that Williams was trying to use him as a conduit to help him concoct a false alibi. Williams's effort fits the definition of a criminal attempt to obstruct justice. That's a crime, and Rule 83.51.6 did not forbid disclosure if the lawyer rea-

sonably believed it was necessary to prevent successful commission of the crime.[1]

But the definition of the crime is actually the last step in the analysis. The focus must first be on the issue of necessity. When a client *insists* on committing perjury, the lawyer faces a difficult problem. How should a lawyer weigh the duty to the client against the duty to the tribunal? Especially for a lawyer in a criminal case, there is no completely satisfactory answer to this difficult question, as Professors Hazard and Hodes explain in detail in their treatise. See generally 2 Hazard & Hodes, The Law of Lawyering §§ 29.15 to 29.21 (reviewing debates and evolution of professional standards for dealing with this dilemma). Because there

---

[1] Since June 2011, the Northern District of Illinois has used the ABA Model Rules of Professional Conduct, which provide a narrower exception in Rule 1.6. See Northern District of Illinois, Rules of Professional Conduct, Local Rule 83.50 (adopted June 2, 2011). My colleagues' criticism of that amendment as "less protective of public safety" is not warranted. As controversial as some of these issues may be, our colleagues in the Northern District could reasonably conclude that rules imposing stronger duties of loyalty and confidentiality are more likely in the long run to encourage clients to trust their lawyers and the lawyers' advice than rules that make it easier for criminal defense lawyers to become witnesses against their clients. That's certainly the predominant view of authorities on professional responsibility. And the amended Northern District rule still allows a lawyer to disclose client confidences to protect lives and safety and to prevent or remedy substantial financial harm.

is no perfect answer here, and because disclosure is permitted only when the lawyer reasonably believes it is *necessary* to prevent the crime or harm, the lawyer has a duty to the client to try to reconcile those conflicting duties to the client and the tribunal before making a disclosure.

That's why agreement in the profession has been universal on the first key point: Before taking any further steps toward disclosure or any other imperfect solution, a lawyer who believes the client intends to commit perjury must, when possible, first confront the client and try to convince him to change course. "It is universally agreed that at a minimum the attorney's first duty when confronted with a proposal for perjurious testimony is to attempt to dissuade the client from the unlawful course of conduct." *Nix v. Whiteside*, 475 U.S. at 169 (holding that lawyer did not deny effective assistance by persuading client not to commit perjury); accord, Model Rules of Professional Conduct, Rule 1.6, comment ¶ 14 (2007) ("Paragraph (b) permits disclosure only to the extent the lawyer reasonably believes the disclosure is necessary to accomplish one of the purposes specified. *Where practicable, the lawyer should first seek to persuade the client to take suitable action to obviate the need for disclosure.*") (emphasis added); Restatement (Third) of Law Governing Lawyers § 120, comment g (2000) ("Before taking other steps, a lawyer ordinarily must confidentially remonstrate with the client or witness not to present false evidence or to correct false evidence already presented. Doing so protects against possibly harsher consequences. The form and content of such a

remonstration is a matter of judgment. The lawyer must attempt to be persuasive while maintaining the client's trust in the lawyer's loyalty and diligence. If the client insists on offering false evidence, the lawyer must inform the client of the lawyer's duty not to offer false evidence and, if it is offered, to take appropriate remedial action."); 2 Hazard & Hodes, The Law of Lawyering § 29.21 ("There is universal agreement that the first step should be to urge the client to rectify the situation, and near-universal agreement that if that approach fails the lawyer must withdraw if possible.").

That is also the instruction of the rules that governed practice in the Northern District of Illinois when Ryan made his disclosure. The district's version of Rule 1.6(b) in 2007 allowed disclosure in case of an intended crime, but the commentary described just what a lawyer should do upon learning that a client intends to commit a crime: "In any instance in which the lawyer learns of a client's intention to commit a crime, where practical the lawyer should seek to persuade the client to take suitable action." Local Rule 83.51.6, Committee Comment. And the comment to the Northern District's adoption of Rule 3.3 specifically discussed the problem of planned perjury by the accused:

> Whether an advocate for a criminally accused has the same duty of disclosure has been intensely debated. While it is *agreed that the lawyer should seek to persuade* the client to refrain from perjurious testimony, there has been dispute concerning the lawyer's duty when that persuasion fails. If the con-

> frontation with the client occurs before trial, the lawyer ordinarily can withdraw. . . . If withdrawal will not remedy the situation or is impossible, the advocate should make disclosure to the court. It is for the court then to determine what should be done — making a statement about the matter to the trier of fact, ordering a mistrial, *or perhaps nothing*.

Local Rule 83.53.3, Committee Comment (emphases added). Note that this guidance assumes that a client's attempt at perjury should *not* be reported to the court if persuasion works. That fits with Rule 83.51.6(b), which allows disclosure to the tribunal if "necessary," meaning that lesser remedial measures either have not worked or will not work. Even if persuasion does not work and disclosure is made to the court, whether any further disclosure should be made (such as to the prosecutor) is a question for the court, not the defense lawyer.

My colleagues emphasize that Williams had completed the crime of attempting to suborn perjury. That is technically correct, but his attempt caused no harm. It is of course possible that Williams, having been thwarted by Ryan, would have tried again. The possibility that he might try again fits this case into the pattern of the client who proposes perjury and who may be persuaded not to follow through. Recall that the standard for a lawyer's disclosure of client confidences is *necessity*. That's true under every relevant version of Rules 1.6(b) and 3.3.(b). Disclosure here could not have been *necessary* unless and until Ryan tried and failed to persuade Williams to change course.

That leads to the second key point on which there is also universal agreement. Even if persuasion fails and the lawyer decides to make a disclosure to the court, the disclosure should be no greater than necessary to accomplish its purpose. This point follows from the standards of necessity and the conflict between the lawyer's duties to both client and tribunal. The commentary to Rule 1.6 is clear:

> In any case, a disclosure adverse to the client's interest should be no greater than the lawyer reasonably believes necessary to accomplish the purpose . . . . If the disclosure will be made in connection with a judicial proceeding, *the disclosure should be made in a manner that limits access to the information to the tribunal or other persons having a need to know it* and appropriate protective orders or other arrangements should be sought by the lawyer to the fullest extent practicable.

Model Rules of Professional Conduct, Rule 1.6, comment ¶ 14 (2007) (emphasis added). The Northern District of Illinois adopted this comment in substance for Local Rule 83.51.6. Accord, *e.g.*, Restatement (Third) § 120, comment h (in taking necessary remedial steps, lawyer must proceed so as to cause "minimal adverse effects" for the client).

The majority treats these points of universal agreement as mere "recommendations" that left lawyer Ryan with broad discretion to disregard them in making his disclosure. The majority also asserts that these standards do not reflect the constitutional standard

of effective counsel under the Sixth Amendment. I respectfully disagree on both points. The Sixth Amendment standard is that of professional reasonableness. Where the standards of professional conduct, including explanatory comments, reflect such a clear and broad consensus as they do here, they provide a reliable guide to the Sixth Amendment and the advocacy that an accused has every right to expect from his lawyer. See *Padilla*, 130 S. Ct. at 1482 (relying on "weight of prevailing professional norms" in applying Sixth Amendment to lawyer's advice on immigration consequences of guilty plea); *Van Hook*, 130 S. Ct. at 17 (relying on general standards in effect at time of trial); *Whiteside*, 475 U.S. at 167-70 (relying on model rules and commentary in applying Sixth Amendment); *Strickland*, 466 U.S. at 688 (Sixth Amendment "relies on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions"). This is not a case that requires fine parsing of the differences between the rules and the commentary.

The relevant professional standards are clear. If a lawyer is to disclose the client's confidential affairs to prevent a crime or prevent other serious harm, the disclosure must be a matter of necessity. Disclosure must be the last resort, not the first response. Unless an emergency makes persuasion impractical, the lawyer first owes the client the opportunity to change his course based on the lawyer's professional advice. And if the lawyer is unable to persuade the client to change

course, the lawyer has a duty to warn the client that the lawyer will need to take remedial action, up to and including disclosing the circumstances to the court, and to withdraw from the representation if possible.[2]

At a minimum, then, in this case Ryan should have told Williams that he had read the letter, advised against perjury, warned Williams that he would disclose the information to the court if necessary, and asked Williams about his intentions. Only if he was not satisfied with Williams's answer should he have asked the court for leave to withdraw. If he provided the court an explanation at all, it should have been filed under seal so the prosecutor would not see it. The duties of loyalty and confidence required at least this degree of effort to protect his client, even from his own criminal stupidity.

Ryan's decision to go straight to the court and prosecutor, without talking with his client first, ran counter to all the sources on standards of professional conduct. In that respect, this case is similar to *Nix v. Whiteside*, where "virtually all of the sources speak with one voice." 475 U.S. at 166 (finding no denial of effective assistance); accord, *McClure v. Thompson*, 323 F.3d 1233, 1241-42 (9th Cir. 2003) (making this point while holding that lawyer did not breach constitutional or professional standards by making anonymous call to police to

---

[2] Such a warning is consistent with Rule 1.6 and Rule 3.3. See Restatement (Third) § 120, comments g & h; 2 Hazard & Hodes, The Law of Lawyering § 29.21.

give locations of kidnapped children he feared were dying and needed rescue). Contrary to professional standards, Ryan transformed himself from the defendant's advocate into a prime witness against him. The lawyer's breach of duties of confidentiality and loyalty was so clear and so basic as to fall below the constitutional standard for effective assistance of counsel. As best I can tell, the majority's acceptance of this lawyer's choice to skip the step of talking to his client, when that step was quite practical, is simply unprecedented.

We should not excuse this failure to consult with or warn the client — and certainly not based on speculation that doing so would have been futile. There was ample time to talk with the client. Ryan could not have known whether Williams would heed advice and a warning that he never gave. The requirement that lawyers attempt to dissuade their clients from illegal acts is based not on optimism about their chances of success, but on the understanding that disclosure must be the last resort for a loyal, confidential advocate whose duties include trying to save the client from his own folly. The Northern District's committee comment to Local Rule 83.51.6 expressed this long-understood preference for lawyers to adopt the role of confidant before the role of informant: "[T]o the extent a lawyer is required or permitted to disclose a client's purposes, the client will be inhibited from revealing facts which would enable the lawyer to counsel against a wrongful course of action. The public is better protected if full

and open communication by the client is encouraged than if it is inhibited."[3]

C.  *Use of the Lawyer's Breaches at Trial*

Ryan's breach of his professional duties would not have caused actual harm to Williams if the prosecutor had not called Ryan as a witness at trial. I join my colleagues' disapproval of the prosecutor's decision to call Ryan to testify against his former client. Model Rule of Professional Conduct 3.8(e) (2007) says that a prosecutor shall

> not subpoena a lawyer . . . to present evidence about a past or present client unless the prosecutor reasonably believes:

> > (1) the information sought is not protected from disclosure by any applicable privilege;

---

[3]  I agree with my colleagues that Williams's attempt to suborn perjury from his cousin was not a privileged attorney-client communication. It was not even a communication between attorney and client. The lawyer's duty of confidentiality is far broader, though. See, *e.g.*, *Stepak v. Addison*, 20 F.3d 398, 406 (11th Cir. 1994), citing *Brennan's Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 172 (5th Cir. 1979); Model Rules of Professional Conduct, Rule 1.6(a) (2007). A lawyer is also bound by a broad duty of loyalty. *Strickland*, 466 U.S. at 688. This duty of loyalty applies even when the client is considering or attempting a foolish and illegal course of action, and it surely includes a duty to try to convince the client to change course.

(2) the evidence sought is essential to the successful completion of an ongoing investigation or prosecution; and

(3) there is no other feasible alternative to obtain the information. . . .

That rule was not adopted by the Northern District of Illinois until ten months after this trial, but it still applied to federal prosecutors in Illinois. See Illinois Rules of Professional Conduct, Ill. S. Ct. R. 3.8(e) (adopted Jan. 1, 2010); 28 U.S.C. § 530B(a) ("An attorney for the Government shall be subject to State laws and rules . . . governing attorneys in each State where such attorney engages in that attorney's duties."); see also *United States v. Colorado Supreme Court*, 189 F.3d 1281, 1288 (10th Cir. 1999) (holding that Colorado rule equivalent to Rule 3.8(e) applied to federal prosecutors). Rule 3.8(e) embodies a very old norm against non-essential testimony from the opposing party's lawyer. See, *e.g., Berd v. Lovelace*, 21 Eng. Rep. 33 (1577) (excusing solicitor from testifying about his client). The government asserts that calling Ryan was consistent with the rule because his testimony was "essential" to the case against Williams. More on that in a moment.

Trial counsel also had an opportunity to try to prevent Ryan's breach of his professional duties of confidentiality and loyalty from harming Williams. Yet trial counsel did not register an objection to Ryan's testimony in either trial. In light of the universal agreement on the lawyer's duty to try first to persuade the client to change course and to warn of the lawyer's duty to

disclose, as well as the duty to minimize harm in the course of withdrawal and disclosure, the lack of objection here is a mystery to me. When a defense lawyer sees the client's former defense lawyer on the government's witness list, alarm bells should ring. There was no apparent tactical reason why the defense would have wanted Ryan to testify, and the prosecution could not point to controlling legal authority authorizing Ryan's chosen course of immediate disclosure to the judge and the prosecution. In the absence of controlling legal authority allowing Ryan's testimony, it should have been obvious that an objection was warranted. The failure to make one fell below professional standards of competency.

The majority asserts that Ryan's testimony could not have violated Williams's right to effective counsel because Williams was no longer his client at trial. I respectfully disagree. The breach of the lawyer's duties of loyalty and confidentiality occurred while he was still representing Williams but seeking to withdraw. More important, though, both duties continue beyond the termination of the lawyer-client relationship. Rule 1.6 imposes no time limits on the duty of confidentiality, and paragraph 18 of the comment makes explicit that the duty of confidentiality continues after termination. Rule 1.9(c) states that a lawyer may not use information relating to representation of a former client to the disadvantage of that client except as the professional rules would permit or require.

The fact that the breaches did not finally cause harm to Williams until the trial does not excuse the original

professional and constitutional breaches. To test the majority's logic on this point, consider the extreme case of the defendant's former lawyer, retired from practice and thus not subject to professional discipline, volunteering to testify for the prosecution about client confidences without even arguable justification for disclosure under Rules 1.6 or 3.3. The constitutional violation in such a case should be obvious. The majority also begs the question by suggesting that a retrial would do no good because the government could just subpoena Ryan again. Such a subpoena, seeking testimony based on client confidences breached in violation of both professional and constitutional standards, should be quashed.

The majority questions, though, whether the appropriate remedy for the lawyer's breaches should have been to exclude his testimony. I agree that an exclusionary remedy should be a last resort rather than a first impulse, but recall that in my view, we are dealing here with a breach of the disclosure of client confidences that violated the lawyer's professional duties and the accused's constitutional rights. No other remedy is apparent. Williams certainly could not sue Ryan for damages on the theory that he was wrongfully convicted as a result of Ryan's breaches. See *Lieberman v. Liberty Healthcare Corp.*, 948 N.E.2d 1100, 1107-08 (Ill. App. 2011) (collecting Illinois cases requiring that conviction be set aside before client can bring legal malpractice claim against criminal defense attorney). The Second Circuit has explained that district courts should have discretion to suppress evidence obtained in violation of ethical rules governing the prosecutor (by interrogating a coun-

seled suspect without informing counsel). *United States v. Hammad*, 858 F.2d 834, 841-42 (2d Cir. 1988). In *Hammad*, the court found that suppression was an error where the underlying ethical standard had not been clear (akin to a good faith exception), but also made clear that suppression would be appropriate to remedy clear constitutional violations and as a part of the court's supervisory powers. *Id.*

The argument for suppression is at least as strong when evidence becomes available because of a defense lawyer's breach of professional duties. A client who hires a lawyer to defend him on criminal charges is entitled to expect the lawyer to comply with both the standards of professional conduct and the Sixth Amendment. When a court appoints a lawyer to represent an indigent defendant, as happens in most cases, that client is entitled to no less. The idea that a client could be convicted based on information disclosed by a court-appointed attorney in violation of his professional and constitutional duties is, to me at least, appalling. It is comparable to using a coerced confession to convict.

The majority suggests that we should not exclude the lawyer's evidence but should rely on discipline for professional misconduct to deter violations of professional standards. For three reasons, that is not a sufficient remedy. First, deterrence is not the sole rationale for exclusionary rules. We have here a violation of a constitutional right by an officer of the court. To protect the integrity of the courts' own role, we should not be a party to using the direct fruits of that violation to

convict and imprison the victim of the violation. Second, professional discipline would provide no remedy for the victim. To make this point clearly, let's suppose the evidence against the defendant were a lot weaker than the actual evidence against Williams, so that we would all agree that the lawyer's testimony affected the verdict. We still should not tolerate use of the lawyer's testimony offered in violation of professional and constitutional duties. Finally, where exclusionary rules are well established, such as with Fourth or Fifth Amendment violations by police officers, the misconduct can subject the officers to civil or even criminal liability, which can also deter. Yet the evidence is still excluded, as it should be here.

"The duty of an attorney to keep his or her client's confidences in all but a handful of carefully defined circumstances is so deeply ingrained in our legal system and so uniformly acknowledged as a critical component of the reasonable representation by counsel that departure from this rule 'make[s] out a deprivation of the Sixth Amendment right to counsel.'" *McClure*, 323 F.3d at 1242-43, quoting *Whiteside*, 475 U.S. at 171. Williams has made that showing here.

II. *Prejudice Under Strickland*

The prejudice prong of *Strickland* requires a convicted defendant to show that, but for his lawyer's unprofessional error, there is a reasonable probability that the outcome would have been different. 466 U.S. at 694. The defendant need not show that an acquittal was

more likely than not, and the fact that evidence was sufficient to convict is certainly not controlling. See *Stanley v. Bartley*, 465 F.3d 810, 814 (7th Cir. 2006). The strong evidence against Williams makes this a close question for me, but the great prejudice caused by his lawyer's breach of loyalty and confidentiality and the prosecution's emphasis on that evidence tip the scales for me in favor of finding prejudice and ordering a new and fairer trial.

The prosecution closed its case with flair, calling lawyer Ryan to tell the jury about Williams's "rotten" scheme to procure false alibi testimony, and just before resting, reading the crude letter aloud to the jury. When Williams testified, the prosecutor finished his cross-examination in devastating fashion by walking Williams through the letter to his cousin line by line, forcing him to admit that each of fifteen statements in the letter was a lie. During closing arguments, the government again emphasized Williams's attempt at a false alibi.

The circumstantial evidence against Williams was certainly strong. The fact that he was found in a car with some of the stolen money a few hours after one robbery was strong evidence that he was involved. He was also wearing shoes that were consistent with tracks left by one of the robbers and stained with a dye that matched a robber's clothing, and he owned a gun like one used in the robberies. But the direct identification evidence was not ironclad. A cooperating accomplice identified Williams and Austin as the robbers after receiving very lenient treatment, and his testimony was vulnerable to

credibility challenges. An admittedly angry ex-girlfriend identified Williams as the masked man from a video by only "his movement and the way he walk," and a neutral witness saw only two people emerging from a getaway car that the prosecution's star cooperating witness said should have held three.

The question for us is whether there is a reasonable probability that the erroneously admitted evidence affected the verdict. Given some of the weak spots in the government's case, it's not hard to imagine a skeptical juror, troubled by doubts, being swayed by another juror's argument: "But if he didn't do it, why would he try to fake an alibi?" And recall that the prosecution has advised us that Ryan's testimony was "essential" to its case, as needed to satisfy Rule 3.8(e). My colleagues disagree with that assessment, but I would give more weight to the prosecution's view of its own case and resolve the close question in favor of a new trial.

Defendant Williams presents one of those rare cases where ineffective assistance can be decided from the contents of the record on direct appeal. I would remand for a new trial of Williams, this time without any mention of lawyer Ryan or the letter as part of the prosecution's case-in-chief.